DA 07-0763

IN THE SUPREME COURT OF THE STATE OF MONTANA

2009 MT 158

STATE OF MONTANA,

     Plaintiff and Appellee,

v.

MARK PATRICK HILGENDORF,

     Defendant and Appellant.

APPEAL FROM:    District Court of the Thirteenth Judicial District,
In and For the County of Yellowstone, Cause No. DC 07-0236
Honorable Gregory R. Todd, Presiding Judge

COUNSEL OF RECORD:

     For Appellant:

          Jim Wheelis, Chief Appellate Defender; Roberta R. Zenker, Assistant
Appellate Defender; Helena, Montana

     For Appellee:

          Hon. Steve Bullock, Montana Attorney General; Micheal S. Wellenstein;
Assistant Attorney General, Helena, Montana

          Dennis Paxinos, Yellowstone County Attorney; Victoria Callender,
Deputy County Attorney,  Billings, Montana

                    Submitted on Briefs:  November 6, 2008

                                  Decided:  May 7, 2009

Filed:

_____
Clerk

Justice Jim Rice delivered the Opinion of the Court.

¶1 Mark Hilgendorf pled guilty to criminal possession of dangerous drugs and drug paraphernalia. Pursuant to the terms of the plea agreement, Hilgendorf reserved the right to appeal the District Court's denial of his motion to suppress evidence of drugs, drug paraphernalia, and any statements made by him or his passenger on the ground that the arresting officer did not have particularized suspicion to stop his vehicle or a warrant to search a closed container seized at the scene. Hilgendorf appeals.

¶2 We affirm and state the issues on appeal as follows:

¶3 1. Did the District Court err by concluding the arresting officer had particularized suspicion to stop Hilgendorf's vehicle?

¶4 2. Did the District Court err by concluding that law enforcement would have inevitably discovered the drugs in the closed container?

**BACKGROUND**

¶5 On March 16, 2007, at approximately 2:00 a.m., while patrolling in Billings in a marked Yellowstone County Sheriff's patrol car, Deputy Chris Romero observed a vehicle parked next to a business on South 23rd Street with its engine running and its lights on. The businesses in this area, which at that late hour were closed, had experienced a high rate of theft and burglary. Romero proceeded past the parked vehicle and circled around the block. The moment Romero's headlights illuminated the rear of the parked vehicle a second time, the car immediately pulled out and quickly drove away. Wondering whether the occupants of the vehicle were engaged in a criminal activity,

2

Romero followed the vehicle. The vehicle stopped at a stop sign and made a right turn onto First Avenue South. Romero noticed that, while the vehicle was driving, the occupants were moving around inside as if they were trying to conceal something. Romero then initiated a stop.

¶6      After stopping his patrol car, Romero saw the driver duck his head down to where he could only see the top of it. Romero demanded the occupants of the vehicle put their hands up. He identified himself and explained why he stopped their vehicle. The driver, later identified as Hilgendorf, told Romero that he had parked near the closed business in order to sign his timecard. Romero noticed the hands of both Hilgendorf and his passenger were shaking and they were acting extremely nervous, which he surmised to be an effect of amphetamine use. Romero returned to his patrol car to check for any outstanding warrants on the occupants, during which time a second officer arrived to provide assistance.

¶7      While in his patrol car, Romero noticed both occupants were moving around inside the vehicle, and the passenger was opening and closing the door on his side as if attempting to discard something. These actions also caused Romero concern for his safety. Interrupting the warrant check, Romero re-approached the vehicle, asked the passenger to exit, and began to frisk the passenger. The passenger resisted and Romero and the second officer restrained him with handcuffs. During the subsequent pat-down search, Romero found an orange container which the passenger promptly admitted contained drugs. After placing the passenger in custody, Romero asked Hilgendorf to

3

exit the vehicle. While patting down Hilgendorf, Romero discovered a drug pipe and arrested him for possession of drug paraphernalia. After handcuffing Hilgendorf, Romero searched him for any additional contraband and found an orange container identical to the one found on the passenger. Romero opened this container and found crystal powder, a razor blade, and a smaller container containing marijuana.

¶8 On March 20, 2007, the State charged Hilgendorf with two counts of Criminal Possession of Dangerous Drugs and Criminal Possession of Drug Paraphernalia. On May 22, Hilgendorf moved to suppress the drugs and paraphernalia found during the investigatory stop, as well as any statements made by him or his passenger. He claimed the investigatory stop was not supported by particularized suspicion, and that Romero had unlawfully examined the contents of the orange container found on his person without a search warrant.

¶9 On July 27, 2007, the court held an evidentiary hearing, at which Romero testified to the foregoing events. After considering the briefs and oral arguments of both parties and Romero's testimony, the District Court denied Hilgendorf's motion. The court found Romero had particularized suspicion to conduct the investigatory stop, and the contents of the orange container found on Hilgendorf would have inevitably been discovered.

¶10 On August 28, 2007, Hilgendorf pled guilty to all the charges against him pursuant to a plea agreement, wherein he reserved his right to appeal the District Court's denial of his motion to suppress. The court deferred imposition of sentence for the felony possession of dangerous drugs for three years, and imposed two six-month suspended

4

sentences for the remaining charges, all of which to run concurrently with each other. Hilgendorf appeals.

## STANDARD OF REVIEW

¶11 We review a district court's denial of a motion to suppress to determine whether the findings of fact are clearly erroneous, and whether the court correctly applied those facts as a matter of law. *State v. Jarman*, 1998 MT 277, ¶ 8, 291 Mont. 391, 967 P.2d 1099.

## DISCUSSION

**¶12 1. Did the District Court err by concluding the arresting officer had particularized suspicion to stop Hilgendorf's vehicle?**

¶13 A police officer may stop any person or vehicle that is observed in circumstances that create a particularized suspicion that the person or occupant of the vehicle has committed, is committing, or is about to commit an offense. Section 46-5-401(1), MCA. To justify the stop, the State must demonstrate objective data available to the officer at the time of the stop resulting in a suspicion that the person has been, is, or will be involved in illegal activity or was a witness thereto. *State v. Gopher*, 193 Mont. 189, 194, 631 P.2d 293, 296 (1981) (citing *U.S. v. Cortez*, 449 U.S. 411, 101 S. Ct. 690, 695 (1981)); *see also Brown v. State*, 2009 MT 64, ¶ 20, 349 Mont. 408, 203 P.3d 842.

¶14 In determining whether these requirements have been satisfied, "[t]he courts will look to the facts and to the totality of the circumstances of each case." *Brown*, ¶ 20. "In evaluating the totality of the circumstances, a court should consider the quantity, or content, and quality, or degree of reliability, of the information available to the officer."

5

*State v. Gilder*, 1999 MT 207, ¶ 11, 295 Mont. 483, 985 P.2d 147 (citing *State v. Pratt*, 286 Mont. 156, 161, 951 P.2d 37, 40 (1997)). "From this data, a trained officer draws inferences and makes deductions—inferences and deductions that might well elude an untrained person." *Cortez*, 449 U.S. at 418, 101 S. Ct. at 695; *see also Brown*, ¶ 20 ("a peace officer's experience and training may be a factor in determining what sort of reasonable inferences he or she is entitled to make from his or her objective observations").

¶15    Hilgendorf contends the facts of this case are similar to previous cases, particularly *State v. Reynolds*, 272 Mont. 46, 899 P.2d 540 (1995), and *Jarman*, wherein we concluded that the respective officers lacked particularized suspicion, and that we should reach the same conclusion here. The State responds by distinguishing the facts here from *Reynolds*, and arguing that the totality of circumstances show "sufficient objective data was available to Deputy Romero for him to draw certain inferences that resulted in his suspicion that Hilgendorf had committed or was about to commit a criminal activity, namely stealing from or burglarizing a closed business."

¶16    We explained in *Reynolds* that, in *Gopher*, "we held that a particularized suspicion existed to justify stopping a vehicle that slowly drove past the crime scene and exhibited an unusual curiosity in the crime site." *Reynolds*, 272 Mont. at 50, 899 P.2d at 542 (citing *Gopher*, 193 Mont. at 194, 631 P.2d at 296). In contrast, we concluded in *Reynolds* that the facts were insufficient to support a particularized suspicion, where the officer observed a car "bordering on traveling a little too fast" and pausing for less than

6

ten seconds before turning at an intersection. *Reynolds*, 272 Mont. at 51, 899 P.2d at 543. We noted that, apart from driving at the higher end of the speed limit and pausing at an intersection while a patrol car was present, the officer failed to state any other information that might have given rise to a particularized suspicion. *Reynolds*, 272 Mont. at 51, 899 P.2d at 543.

¶17 In *Jarman*, an officer responding to a report of domestic disturbance saw Jarman using a public telephone in the area where the caller alleged her boyfriend would be walking. *Jarman*, ¶¶ 3-4. The area around the phone booth was known for above average criminal activity. *Jarman*, ¶ 15. The officer circled the block, and when he returned Jarman was gone and the phone hung down off the receiver. *Jarman*, ¶ 4. We concluded that "nothing in th[e] record connected Jarman to the domestic disturbance other than the fact that he was the only male Officer Korell observed in the area" and that "[b]eing in a high crime area by itself" could not establish particularized suspicion. *Jarman*, ¶¶ 11, 14. Absent additional facts connecting Jarman to the domestic disturbance or showing Jarman was evading the officer, we concluded that "a reasonable and articulable suspicion" had not been demonstrated. *Jarman*, ¶ 15.

¶18 Hilgendorf does not contest that his car was parked near a business at 2:00 a.m., when all of the area businesses were closed, that the area was known for its thefts from and burglaries of the businesses, or that he quickly left upon the second approach of the police vehicle. However, Hilgendorf's argument that the facts of this case are similar to those of *Reynolds* and *Jarman*, requiring the same conclusion, fails to consider at least

7

one critical fact: that Romero also observed that both Hilgendorf and his passenger were moving around inside the vehicle as if trying to conceal something in the vehicle. Denying that he initiated the stop for a traffic violation, Romero testified the stop was made because the occupants "were busy moving around inside the vehicle" and that "the actions they were taking, a normal person wouldn't be doing," leading to his conclusion that "I felt there could be something going on, like somebody committing a theft" and his decision to initiate a stop. These observations, combined with what Romero had initially observed, were objective data from which Romero could make inferences about the possibility of a crime and come to a resulting suspicion that a theft could be in progress. These facts distinguish this case from the holdings in *Jarman* and *Reynolds*. Romero did not base the stop solely on Hilgendorf's presence in a high crime area or the lack of other drivers in the area, but upon various additional facts, including the abrupt takeoff upon his second approach and the peculiar actions of the people inside the car while it was moving.

¶19    Hilgendorf also argues that because the stop was improper, the frisk which followed and revealed the drug evidence was also improper and, further, that the frisk was not justified by a concern for weapons. However, because we conclude the stop was proper, we do not address these alternative arguments.

¶20    **2. Did the District Court err by concluding that law enforcement would have inevitably discovered the drugs in the closed container?**

¶21    Hilgendorf contends that, even if Romero had particularized suspicion to make the investigative stop and seize the container found on Hilgendorf's person, Romero was not

justified in opening the closed container without obtaining a warrant. Hilgendorf concedes that police could have opened the container without a warrant if exigent circumstances had existed, but argues an exigency did not exist here. Hilgendorf notes Romero had placed him in handcuffs, a second officer was there to assist him, and Hilgendorf was not resistant. The State responds that the drug evidence found in the container would have been inevitably discovered during the inventory search at the detention facility, following Hilgendorf's arrest.

¶22 The District Court agreed with the State's inevitable discovery theory, orally denying the motion to suppress:

> The one question I have is opening the containers, the orange container and the film container without a warrant . . . there's a discussion on inevitable discovery. It appears that both people—well, the passenger was under arrest as soon as—I believe from what I heard there was a pipe also found in the defendant's pants. So there was an arrest of both parties there. And while better practice may have been to obtain a warrant if both were arrested, there were going to go down, all of that stuff would have been inventoried, and I think it's inevitable.

¶23 Under the Montana and United States Constitutions, warrantless searches are per se unreasonable unless an exception applies. *State v. Hamilton*, 2003 MT 71, ¶ 34, 314 Mont. 507, 67 P.3d 871. If an exception to the warrant requirement is not established, the evidence obtained as a result of an unreasonable search or seizure is excluded. *Wong Sun v. U.S.*, 371 U.S. 471, 484-85, 83 S. Ct. 407, 416 (1963). The exclusionary rule ensures protection against the government's intrusion on an individual's constitutional right to be free from such unreasonable searches and seizures. *Wong Sun*, 371 U.S. at 485, 83 S. Ct. at 416.

9

¶24　The exclusionary rule is not without exception.　As we recently explained:

> [W]e have long accepted three general exceptions to exclusion of this type of tainted evidence.　In *State v. Allies*, 186 Mont. 99, 117, 606 P.2d 1043, 1052-53 (1979), we noted that "fruit of the poisonous tree" is admissible: (1) if it is attenuated from the constitutional violation so as to remove its primary taint (*Wong Sun v. United States*, 371 U.S. 471, 487-88, 83 S. Ct. 407, 417 (1963)); (2) if it is obtained from a source independent of the defendant's confession (*Silverthorne Lumber Co. v. United States*, 251 U.S. 385, 392, 40 S. Ct. 182, 183 (1920)); or (3) if it is inevitable that the evidence would have been discovered apart from the defendant's confession.　*Government of Virgin Islands v. Gereau*, 502 F.2d 914, 927-38 (3d Cir. 1974).

*State v. Dickinson*, 2008 MT 159, ¶ 19, 343 Mont. 301, 184 P.3d 305.　The State argues that we apply the third exception, inevitable discovery.

¶25　In applying the inevitable discovery doctrine, it must appear "as certainly as night follows day, the evidence would have been discovered without reference to the violation of the defendant's rights." *Dickinson*, ¶ 25 (quoting *State v. Allies*, 186 Mont. at 118, 606 P.2d at 1053).　The State argues that the container found on Hilgendorf's person would have been opened and examined during a standard inventory search in the booking process, and therefore qualifies for application of the doctrine.　Hilgendorf responds that the doctrine cannot be applied because no evidence was presented in the District Court to establish that an inventory search is a standard procedure.[1]

¶26　Regarding station house inventory searches we have explained, "it is both unrealistic and unsafe for the police to fail to take routine, administrative steps to protect

---

[1] Hilgendorf did not address the District Court's inevitable discovery rationale in his opening brief, and did not offer an analysis in response to the State's argument for application of the doctrine in the District Court.

themselves, the arrestee and others in the station house from the actual or potential danger such persons pose," *State v. Pastos*, 269 Mont. 43, 49, 887 P.2d 199, 203 (1994), and inventory searches are "not subject to the probable cause strictures of § 46-5-402(2), MCA." *State v. Heath*, 2000 MT 94, ¶ 18, 299 Mont. 230, 999 P.2d 324. The purpose of an inventory search "is not to discover and preserve evidence, but rather, is to protect police and other prisoners from potential danger and to protect police and the arrestee by creating an accounting of personal items." *State v. Hardaway*, 2001 MT 252, ¶ 53, 307 Mont. 139, 36 P.3d 900. The legitimate and compelling interest of the State to protect persons in and around the police station justifies the routine, administrative inventory search of property on the arrestee at the station following the arrestee's arrest. *Pastos*, 269 Mont. at 48-49, 887 P.2d 202-03.

¶27 It is undisputed that Hilgendorf was going to be arrested for possession of drug paraphernalia and taken to jail, and Hilgendorf made no challenge in the District Court or in his opening brief that the State failed to demonstrate that he would have been subjected to a standard inventory search. We therefore conclude that the contents of the container would have been inevitably discovered, and we need not address Hilgendorf's arguments that the warrantless search was improper. *Dickinson*, ¶ 28.

¶28 The District Court properly denied the motion to suppress.

¶29 Affirmed.

/S/ JIM RICE

11

We concur:

/S/ JOHN WARNER
/S/ PATRICIA COTTER
/S/ BRIAN MORRIS

Justice W. William Leaphart, dissenting.

¶30     I dissent as to issue one and would not reach issue two.

¶31     I disagree with the Court's conclusion that Officer Romero had a particularized suspicion to stop Hilgendorf's vehicle. The officer saw Hilgendorf's vehicle at 2 a.m. legally parked on South 23rd Street with its engine running and lights on. Because businesses in this area had experienced a high rate of theft and burglary, Officer Romero drove past the vehicle and circled around a second time. Upon the officer's second approach, Hilgendorf pulled out and drove away. Officer Romero noted that, as they pulled away, the occupants were moving around as if they were trying to conceal something. Based upon this scant information, the officer initiated a stop.

¶32     The gravamen of particularized suspicion is missing. That is, the totality of the circumstances confronting Officer Romero at the time of the stop did not create an objective basis for suspecting criminal activity. *State v. Van Kirk*, 2001 MT 184, ¶ 15, 306 Mont. 215, 32 P.3d 735. The facts of the present case are no more compelling than

12

those in *State v. Reynolds*, 272 Mont. 46, 899 P.2d 540 (1995), where the officer observed the defendant driving "bordering on traveling too fast" and waiting at an intersection for seven to ten seconds. The officer in *Reynolds* conceded that "the presence of a police car . . . could have an unnerving effect on a driver's normal driving routine." *Reynolds*, 272 Mont. at 56, 899 P.2d at 543. On appeal, we concluded that, "under the totality of the circumstances and facts in this case, the possible traffic violation combined with no other objective data does not support a particularized suspicion that Reynolds had been engaged in wrongdoing." *Reynolds*, 272 Mont. at 56, 899 P.2d at 543. As in *Reynolds*, Hilgendorf became unnerved at the officer's presence and drove away quickly. Unlike *Reynolds*, he did not commit or "border" on committing any traffic offense.

¶33    Our decision in *State v. Jarman*, 1998 MT 277, 291 Mont. 391, 967 P.2d 1099 is also instructive. In *Jarman*, Officer Korell was responding to a domestic disturbance call at approximately 3 a.m. As he drove, he observed an individual later identified as Jarman standing beside a car at an outside pay telephone. No one else was in the area. The officer drove around the block and back to the phone. By that time Jarman and his car were no longer there. The phone was off the hook. Continuing to patrol the area, the officer observed Jarman's car leaving a parking lot. The officer initiated a traffic stop during which he discovered a knife, illegal drugs, and a gun. The district court denied Jarman's motion to suppress for lack of particularized suspicion. On appeal, we reversed and noted first that, "[b]eing in a high crime area by itself does not give the police a

13

particularized suspicion to stop a person." *Jarman*, ¶ 14. The justifications offered for the stop were that Jarman was talking on a pay phone on a cold night in a high crime area and that after Officer Korell drove around the block, Jarman was gone and the telephone receiver was hanging down off the hook. We concluded the following:

> These facts do not rise to the level of a reasonable and articulable suspicion that Jarman was, had been, or was about to engage in criminal activity. Without any connection to the domestic disturbance or reasonable suspicion of evasion, Officer Korell had no reason to stop Jarman. We hold that the District Court's conclusion that Officer Korell had a particularized suspicion was erroneous.

*Jarman*, ¶ 15 (emphasis omitted).

¶34 Like *Jarman*, Hilgendorf was in a high crime area late at night. That fact combined with a quick departure when the officer circled around the block did not, however, give rise to a particularized suspicion. It is noteworthy that we found no particularized suspicion in *Jarman* even though the officer was patrolling in the context of a reported crime (domestic abuse). Here, the situation was even less "particularized" since Officer Romero was not responding to any specific crime report.

¶35 Officer Romero may have had a general suspicion of criminal activity, but there was certainly nothing "particularized" about his concerns.

/S/ W. WILLIAM LEAPHART

Justice James C. Nelson joins the dissenting opinion of Justice W. William Leaphart.

/S/ JAMES C. NELSON

14