

DA 10-0148

IN THE SUPREME COURT OF THE STATE OF MONTANA

2011 MT 55

STATE OF MONTANA,

        Plaintiff and Appellee,

   v.

THOMAS GAIL PEARSON,

        Defendant and Appellant.

APPEAL FROM:    District Court of the Thirteenth Judicial District,
In and For the County of Yellowstone, Cause No. DC 09-0378
Honorable Susan P. Watters, Presiding Judge

COUNSEL OF RECORD:

        For Appellant:

        Robin A. Meguire, Attorney at Law, Great Falls, Montana

        For Appellee:

        Steve Bullock, Montana Attorney General; Micheal S. Wellenstein, Assistant
Attorney General, Helena, Montana

        Dennis Paxinos, Yellowstone County Attorney; Ingrid A. Rosenquist, Deputy
County Attorney, Billings, Montana

Submitted on Briefs:   January 5, 2011
Decided:   March 23, 2011

Filed:

_____
Clerk

Justice Brian Morris delivered the Opinion of the Court.

¶1 Appellant Thomas Gail Pearson (Pearson) appeals from an order of the Thirteenth Judicial District Court, Yellowstone County, denying his motion to suppress and dismiss evidence. We affirm.

¶2 We review the following issues on appeal:

¶3 *Whether the officers' conduct exceeded the scope of Pearson's traffic stop.*

¶4 *Whether the officers inevitably would have discovered the evidence obtained in the officers' unwarranted second search of Pearson's fanny pack.*

FACTUAL AND PROCEDURAL HISTORY

¶5 The State of Montana (State) charged Pearson with criminal possession of dangerous drugs, criminal possession of drug paraphernalia, and operating a motor vehicle without proof of insurance. The charges stem from a routine traffic stop that led to a search of Pearson's fanny pack and car. Officer LaMantia (LaMantia) and his field training officer, Officer Kristjanson (Kristjanson), stopped Pearson after they had observed Pearson driving with a broken tail light.

¶6 Pearson pulled into a parking lot and parked his car instead of pulling to the side of the road. The officers watched Pearson make furtive movements in the car as LaMantia approached. The officers testified that Pearson had appeared to stretch across the passenger seat. Kristjanson feared that Pearson may have been reaching for a weapon. Kristjanson also saw a "meth watch" sticker in the car window. Kristjanson testified that he knew that users of methamphetamine often put "meth watch" stickers on their cars.

2

¶7 When LaMantia approached the car he saw Pearson clutching a large wad of cash in his hands. LaMantia also discovered that Pearson did not have any insurance for the car and that his registration had expired. LaMantia returned to his patrol car and explained Pearson's odd behavior to Kristjanson. Officer Kristjanson ran a search on Pearson's license that revealed that Pearson was on probation and had a drug history.

¶8 Kristjanson approached the car and asked Pearson to put down the wad of money and step out of the car. Pearson stepped out of the car and the officers removed his fanny pack. Kristjanson patted down Pearson and searched his fanny pack for weapons. Kristjanson did not find any weapons or contraband. Shortly after searching the fanny pack Kristjanson looked into Pearson's car and saw a can of pepper spray in plain view near the driver's seat by the center console. Kristjanson knew that probationers lawfully cannot possess a weapon, including pepper spray. Kristjanson handcuffed and detained Pearson for the probation violation and placed him in the patrol car. Kristjanson attempted to contact Pearson's probation officer, Officer Pinnick (Pinnick).

¶9 Pearson gave the officers written consent to search his car. Officer Vickery (Vickery) assisted Kristjanson and LaMantia with the search. The officers found drug paraphernalia in Pearson's car. Vickery also found a bindle of methamphetamine during a second search of Pearson's fanny pack. Kristjanson reached Pinnick by telephone while still at the scene, but after the officers already had searched Pearson's car and fanny pack. Pinnick authorized a probation violation hold on Pearson. The officers transported Pearson to the Yellowstone County Detention Facility.

3

¶10    Pearson moved to suppress the evidence obtained in the searches. The District Court denied Pearson's motion to suppress. The court concluded that officer safety concerns justified the first search of Pearson's fanny pack. The court similarly determined that Pearson's written consent justified the officers' search of his car. The court also held that the officers' second search of the fanny pack constituted an unlawful search. The court declined, however, to suppress the methamphetamine found during the second search of Pearson's fanny pack. The court determined that either a subsequent probation search authorized by Pinnick or a routine inventory search at the detention center would have led officers to discover the methamphetamine. Pearson appeals.

## STANDARD OF REVIEW

¶11    We review a district court's findings of fact for clear error and its conclusions of law for correctness to determine whether the district court correctly ruled on a motion to suppress evidence. *State v. Hurlbert*, 2009 MT 221, ¶ 16, 351 Mont. 316, 211 P.3d 869. This Court conducts plenary review of the district court's application of the law. *Id.*

## DISCUSSION

¶12    *Whether the officers' conduct exceeded the scope of Pearson's traffic stop.*

¶13    Pearson does not challenge the lawfulness of the officers' initial investigatory stop of his car for the broken tail light. Pearson argues instead that the officers exceeded the scope of an otherwise lawful investigatory stop. An investigative traffic stop may not last longer than necessary for the officer to effectuate the purpose of the stop. Section 46-5-403, MCA; *Hurlbert*, ¶ 21. Additional objective data of wrongdoing that gives rise to further suspicions

4

may enlarge the scope of a routine traffic stop. *Hurlbert,* ¶ 21 (citing *State v. Case*, 2007 MT 161, ¶ 34, 338 Mont. 87, 162 P.3d 849).

¶14     An officer stopped the defendant in *Hurlbert* for speeding. The officer observed that Hurlbert appeared uneasy and exhibited nervous behavior such as shaking, sweating, rapidly smoking a cigarette, and constantly moving. Hurlbert told the officer that he had been visiting his parents, but could not remember their address. The officer asked Hurlbert whether he had any illegal drugs in the car. The officer eventually obtained consent to search the car. Hurlbert argued that the officer's questioning after the stop unlawfully had expanded the scope of the traffic stop to the point that any evidence obtained thereafter should have been suppressed. We concluded that the officer had observed sufficient additional evidence that served to enlarge the scope of the investigation and that the officer properly had questioned Hurlbert about the contents of the car. *Hurlbert*, ¶¶ 22-23.

¶15     Kristjanson and LaMantia testified that they had observed unusual behavior after they had stopped Pearson for a broken tail light. This unusual behavior had raised the officers' suspicions. Pearson pulled off the road and into a parking spot instead of pulling over on the side of the road. Pearson jerked about nervously in the car and appeared to reach to the passenger seat for what Kristjanson feared might have been a weapon. Both officers saw Pearson tightly gripping a wad of cash in his hand. Kristjanson saw a "meth watch" sticker in the rear window of the car, and suspected illegal drug use. A check on Pearson's driver license revealed that he was on probation and had a drug history.

¶16     These articulable facts obtained after the initial stop for a broken tail light supported

5

the officers' suspicion that Pearson might have weapons or contraband in his car. *Id.* at ¶ 21. This suspicion properly served to enlarge the scope of Pearson's traffic stop and justified the officers' additional questioning. *Id.* at ¶ 23.

¶17 *Whether the officers inevitably would have discovered the evidence obtained in the officers' unwarranted second search of Pearson's fanny pack.*

¶18 The Montana and U.S. Constitutions deem warrantless searches per se unreasonable unless a warrant exception applies. *Hurlbert*, ¶ 19. Officers do not need a warrant for an investigative stop and frisk, for an administrative post-arrest inventory search, or for a search authorized by consent. Section 46-5-401, MCA; *State v. Hilgendorf*, 2009 MT 158, ¶ 26, 350 Mont. 412, 208 P.3d 401; *State v. Snell*, 2004 MT 269, ¶ 9, 323 Mont. 157, 99 P.3d 191.

¶19 An officer may frisk a person whose car lawfully has been stopped and may take other reasonably necessary steps for protection if the officer reasonably believes that the person is armed and dangerous. Section 46-5-401(2)(b), MCA; *State v. Gopher*, 193 Mont. 189, 194, 631 P.2d 293, 296 (1981). Kristjanson testified that he saw Pearson reach across the passenger seat after he had stopped Pearson's car. Kristjanson also testified that he thought that Pearson might have been reaching for a weapon. Kristjanson frisked Pearson and searched his fanny pack for weapons for officer safety reasons. Kristjanson's initial search of Pearson's fanny pack constituted a lawful investigative stop and frisk. Section 46-5-401, MCA.

¶20 Kristjanson saw Pearson's pepper spray in the front seat of his car in plain view shortly after he had conducted the investigative stop and frisk. Kristjanson knew from his

check of Pearson's license that Pearson was on probation. Kristjanson placed Pearson in handcuffs and escorted him to the patrol car. Kristjanson informed Pearson that he needed to contact Pearson's probation officer and asked the operator for Pinnick's phone number. Pearson then gave the officers written consent to search his car.

¶21 Pearson does not challenge whether he voluntarily consented to the search. Pearson also does not argue that the officers' failure to *Mirandize* him violated his rights. Pearson argues instead that he consented only to a search of his car, and, therefore, the second search of his fanny pack constituted an unlawful search. He argues that the Court should suppress any evidence obtained from the unlawful second search.

¶22 Pearson's written consent gave the officers permission to search only his car. Vickery conducted an unwarranted second search of Pearson's fanny pack that revealed a bindle of methamphetamine. The officers did not have a warrant or warrant exception to support the second search of Pearson's fanny pack. We agree with the District Court that the officers exceeded their authority when they searched Pearson's fanny pack for a second time. The District Court concluded, however, that the doctrine of inevitable discovery applied and thereby rendered admissible the evidence.

¶23 The court determined that the officers inevitably would have discovered the bindle of methamphetamine either during a search of Pearson's fanny pack authorized by Pearson's probation officer, or during an inventory search at the detention center after the officers had transported Pearson there for a probation violation based on the pepper spray. We do not address whether Pinnick's "after-the-fact" authorization of a probationary search of

7

Pearson's fanny pack and car would have justified the unlawful search. We focus instead on whether the officers inevitably would have discovered the methamphetamine during an inventory search at the detention center after the officers had detained Pearson for the probation violation.

¶24    The exclusionary rule excludes evidence unlawfully obtained from a search without a warrant or warrant exception. *Hilgendorf*, ¶ 23 (citing *Wong Sun v. U.S.*, 371 U.S. 471, 484-85, 83 S. Ct. 407, 416 (1963)); § 46-13-302, MCA. The exclusionary rule does not apply, however, if the unlawfully obtained evidence would have been discovered despite the unlawful government intrusion. *Hilgendorf*, ¶ 24. The Court generally applies the doctrine of inevitable discovery when investigatory procedures already were in progress and the lawful investigation eventually would have revealed the evidence. *See Nix v. Williams*, 467 U.S. 431, 449-50, 104 S. Ct. 2501, 2511-12 (1984). This Court has made clear that it must appear "as certainly as night follows day" that the evidence would have been discovered without reference to the violation of the defendant's rights. *Hilgendorf*, ¶ 25 (citing *State v. Dickinson*, 2008 MT 159, ¶ 25, 343 Mont. 301, 184 P.3d 305).

¶25    The Court's analysis in *Hilgendorf* proves instructive here. An officer lawfully stopped Hilgendorf's vehicle and conducted a pat-down search. *Hilgendorf*, ¶¶ 7, 19. The officer discovered drug paraphernalia and placed Hilgendorf in handcuffs. *Id.* at ¶ 27. The officer conducted a second search of Hilgendorf after he had handcuffed Hilgendorf and discovered a small container holding crystal powder and marijuana. *Id.* at ¶ 7. Hilgendorf argued that the court should have suppressed the evidence obtained in the unauthorized

8

second search.

¶26 The Court did not address whether the second search of Hilgendorf required a warrant. The Court determined instead that the officer clearly had intended to arrest Hilgendorf for possession of drug paraphernalia based on the fact that they had found drug paraphernalia and had placed Hilgendorf in handcuffs. *Id.* at ¶ 27. The Court concluded, therefore, that the officers inevitably would have discovered the container of drugs in an inventory search at the detention center. *Id.*

¶27 Here Kristjanson already had discovered pepper spray in plain view and drug paraphernalia in a lawful search of Pearson's car. Pearson consented to the officers' search of his car. Kristjanson had placed Pearson in handcuffs, placed him in the patrol car, and attempted to contact his probation officer to gain permission to transport him, before the second search took place. *Id.* Kristjanson testified that he had intended to detain and arrest Pearson based solely on the pepper spray violation. Similar to the offense in *Hilgendorf*, Kristjanson had intended to arrest Pearson before the illegal second search of Pearson's fanny pack. *Id.*

¶28 The evidence establishes that Kristjanson would have taken Pearson to the detention center and that Officer Pinnick would have authorized Pearson's arrest based solely on the pepper spray violation or the drug paraphernalia. Officers at the detention center would have subjected Pearson to a routine inventory search at the detention center. The officers inevitably would have discovered the methamphetamine found in the second search of Pearson's fanny pack during a routine inventory search.

9

¶29 The Dissent argues that the record does not support the Court's decision. Dissent, ¶ 48. We disagree. The District Court asked Kristjanson whether he had intended to arrest Pearson based solely on the pepper spray violation:

> Q. Prior to the consent to search being signed and the paraphernalia found in the vehicle, as well as the drugs found in the fanny-pack, was your intention to detain him and probably take him to the detention facility on a reported violation or a PV hold after confirming with the probation officer?
> A. Yes.

Again the court asked:

> Q: I think you testified that you intended to take the defendant to jail for the probation violation, that being the pepper spray; is that correct?
> A: Yes, Your Honor.

¶30 The Dissent focuses on the next questions:

> Q: Do you ever [transport a probationer] without talking to the probation officer first?
> A: Never, Your Honor.
> Q: So at the time on the video that you're placing the defendant in handcuffs, you're detaining him for what you believe to be a probation violation?
> A: Yes, Your Honor.
> Q: And that's the pepper spray?
> A: Yes, Your Honor.
> Q: But you would not actually transport him until you talked to the probation officer?
> A: Correct.
> Q. What if you hadn't -- Did you ever talk to Pinnick on that night?
> A. Yes.
> Q. And when would that have been?
> A. It was sometime after placing him in the vehicle, in the patrol car.
> Q. And did he say he wanted him held on a PV hold?
> A. Yes, he did.

¶31 The court again asked Kristjanson what he had intended to do with Pearson immediately after he had discovered the pepper spray in plain view:

Q: And so at that point were you detaining him?
A: I was.
Q: Were you in contact with a probation officer?
A: I was.

The court then listens to the audio recording from the patrol car. Kristjanson explains that he was asking the operator to send him Pinnick's cell phone number. This activity took place before Vickery had searched Pearson's fanny pack. The record demonstrates that investigatory procedures already were in progress based solely on the pepper spray violation before the illegal search took place. *Nix*, 467 U.S. at 449-50, 104 S. Ct. at 2511-12.

¶32 The Dissent argues that because Pinnick did not authorize Pearson's detention until after Vickery had searched the fanny pack, the inevitable discovery doctrine could not justify the search. Dissent, ¶ 50. The facts establish that Kristjanson was in the process of lawfully arresting Pearson based solely on the pepper spray violation when Vickery discovered the methamphetamine. *Hilgendorf*, ¶ 27. Lawful investigatory procedures that inevitably would have led to the officers' discovery of methamphetamine in Pearson's fanny pack were in progress when Vickery unlawfully searched the fanny pack for a second time. *Nix*, 467 U.S. at 449-50, 104 S. Ct. at 2511-12.

¶33 Kristjanson informed Pinnick about all the violations—the pepper spray, the drug paraphernalia, and the methamphetamine—when he reached Pinnick on his cell phone. Pinnick testified that Pearson's possession of the pepper spray alone violated the conditions of Pearson's probation and would have justified his arrest. Pinnick authorized Pearson's arrest based on the pepper spray, the drug paraphernalia, and the methamphetamine,

11

however, because Kristjanson had reported everything. This fact does not contradict the notion that the pepper spray violation alone justified Pearson's arrest.

¶34 The search of Pearson's fanny pack is not justified by an unlawful "after-the-fact" consent. Pearson's possession of pepper spray violated the conditions of his probation and subjected him to immediate detention. The officers had substantial evidence to detain Pearson before, and independent of, the unlawful search of Pearson's fanny pack that revealed the bindle of methamphetamine. The evidence supports our conclusion that Pearson would have been subjected, therefore, to a routine inventory search at the detention center. The officers inevitably would have discovered the methamphetamine in Pearson's fanny pack.

¶35 Affirmed.

/S/ BRIAN MORRIS


We Concur:

/S/ BETH BAKER
/S/ PATRICIA COTTER
/S/ MICHAEL E WHEAT




Justice James C. Nelson, concurring and dissenting.

12

¶36 I concur with the Court's decision in Issue 1. However, I dissent from the Court's decision in Issue 2 that the inevitable discovery doctrine justifies the admission of the evidence obtained from the second search of Pearson's fanny pack. In my view, the Court has incorrectly applied the inevitable discovery doctrine to the facts in this case.

¶37 The District Court concluded, and this Court agreed, that although the officers exceeded their authority when they searched Pearson's fanny pack for a second time, the evidence was admissible. The District Court reasoned that the testimony of Officer Pinnick, Pearson's probation officer, that he would have authorized a search of Pearson's fanny pack had he been asked, rendered the evidence admissible via the inevitable discovery doctrine. However, under this Court's precedent, such a post-search authorization does not overcome the illegality of the search.

¶38 The District Court also reasoned that the evidence would inevitably have been discovered during an inventory search at the detention facility when Pearson was transported there at Officer Pinnick's direction for a probation violation based on possession of the pepper spray. However, this presupposes that the officers had decided to arrest Pearson and transport him to the detention facility even before they searched the fanny pack for the second time. The facts in this case do not support that conclusion.

¶39 Warrantless searches, as in the instant case, are considered per se unreasonable unless an exception to the warrant requirement applies. *State v. Dickinson*, 2008 MT 159, ¶ 18, 343 Mont. 301, 184 P.3d 305 (citing *State v. Ruggirello*, 2008 MT 8, ¶ 17, 341 Mont. 88, 176 P.3d 252). Where no exception exists, the exclusionary rule bars the admission at trial of

13

evidence obtained as a result of an unconstitutional search or seizure. *State v. Ellis*, 2009 MT 192, ¶ 48, 351 Mont. 95, 210 P.3d 144. The primary purpose of the exclusionary rule is to deter illegal police conduct and to preserve judicial integrity. *Ellis*, ¶ 48.

¶40 The inevitable discovery doctrine is an exception to the exclusionary rule. *Ellis*, ¶ 48 (citing *Dickinson*, ¶ 19). It allows the introduction of illegally obtained evidence where the government proves by a preponderance of the evidence that the tainted evidence would inevitably have been discovered through lawful means. *Ellis*, ¶ 49 (citing *United States v. Mejia*, 69 F.3d 309, 319 (9th Cir. 1995)). However, we have held that evidence which comes to light as a result of the exploitation of an initial illegal act of the police cannot be justified under the inevitable discovery doctrine. *State v. Therriault*, 2000 MT 286, ¶ 57-60, 302 Mont. 189, 14 P.3d 444.

*Search authorized by probation officer*

¶41 While we have held that a search of a probationer's effects may be conducted without a search warrant, we have also held that the search *must be authorized by the probation officer. See State v. Meza*, 2006 MT 210, ¶ 29, 333 Mont. 305, 143 P.3d 422 ("As a general matter, searches of parolees conducted by police officers are permissible *with the consent of the parole officer*." (emphasis added)); *see also State v. Boston*, 269 Mont. 300, 305, 889 P.2d 814, 817 (1994); *State v. Burke*, 235 Mont. 165, 766 P.2d 254 (1988); *State v. Burchett*, 277 Mont. 192, 921 P.2d 854 (1996). " '[T]he probation officer must be able to supervise the probationer [or parolee], and *upon his judgment and expertise*, search the probationer's [or

14

parolee's] residence or cause it to be searched.' " *Boston*, 269 Mont. at 305, 889 P.2d at 817 (emphasis added) (quoting *Burke*, 235 Mont. at 171, 766 P.2d at 257).

¶42     In this case, the officers had every opportunity to call Officer Pinnick before initiating the second search of the fanny pack. Their failure to secure Officer Pinnick's authorization *prior* to the second search of the fanny pack cannot be justified after the fact by the inevitable discovery doctrine. Such an after-the-fact authorization from a probation officer is similar to the after-the-fact consent to search we held improper in *Ellis*.

¶43     In that case, law enforcement officers had the victim fill out a form giving officers permission to search her father's residence after the officers had already searched it and seized various items. *Ellis*, ¶ 45. We stated in that case that this after-the-fact consent was ineffective because " 'to be valid and qualify as an exception to the warrant requirement, a consent must *precede* a search.' " *Ellis*, ¶ 45 (quoting *State v. Hubbel*, 286 Mont. 200, 216, 951 P.2d 971, 980 (1997), *overruled on other grounds by State v. Hendricks*, 2003 MT 223, 317 Mont. 177, 75 P.3d 1268). We further stated that " 'to be lawful, a search and seizure must be justified *from the beginning*.' " *Ellis*, ¶ 45 (quoting *Hubbel*, 286 Mont. at 216, 951 P.2d at 981); *see also Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868 (1968).

¶44     Inevitable discovery applies when the investigatory procedures were already in progress prior to the illegal search. *Ellis*, ¶ 55 (citing *Nix v. Williams*, 467 U.S. 431, 104 S. Ct. 2501 (1984) (two hundred volunteers were already searching the area where the defendant had abandoned his victim's body before the defendant gave an illegally obtained statement about the exact location of the body); *State v. Adkins*, 2009 MT 71, 349 Mont. 444,

15

204 P.3d 1 (imminent probation search of residence inevitably would have led to discovery of drugs); *State v. Lacey*, 2009 MT 62, 349 Mont. 371, 204 P.3d 1192 (defendant's computer containing images of defendant sexually abusing his girlfriend's minor daughter was not searched based on girlfriend's consent, but pursuant to a federal search warrant); *Dickinson*, ¶¶ 3-7 (upon speaking with the occupants of a hotel room on another matter, officers observed through the open door the presence of weapons; the officers first secured the room and the weapons before applying for a search warrant); *State v. Notti*, 2003 MT 170, 316 Mont. 345, 71 P.3d 1233 (multiple DNA databases matching the defendant to another crime were already established before the search)).

¶45    Here, the evidence seized from Pearson's fanny pack was not the inevitable product of a legal probationary search already in progress.  The District Court's reasoning to the contrary assumes a post-search authorization can cure the illegality of the search, but the inevitable discovery doctrine is not meant to justify law enforcement's decision to not follow proper procedure.

¶46    The State argues here that it would have searched the fanny pack legally had they not already searched it illegally.  We stated in *Ellis* that "[a]llowing the introduction of evidence under the inevitable discovery doctrine in this case would 'amount to the unacceptable assertion that police would have done it right had they not done it wrong.' " *Ellis*, ¶ 57 (quoting *State v. Davolt*, 84 P.3d 456, 469 (Ariz. 2004)); *see also State v. Topanotes*, 76 P.3d 1159, 1164 (Utah 2003) ("the argument that 'if we hadn't done it wrong, we would have

16

done it right' . . . is far from compelling") (quoting *United States v. Thomas*, 955 F.2d 207, 210 (4th Cir. 1992)).

*Inventory search at detention facility*

¶47    Nor can the admission of the evidence in this case be justified on the basis that the fanny pack would have been searched at the detention facility in any event.  This argument relies on the assumption that Pearson would have been detained for the pepper spray violation alone.  However, Officer Pinnick did not testify that he would have authorized a *probation hold* absent the drug evidence.  Rather, he testified that he would have authorized a *search* of Pearson's vehicle and fanny pack had the officers contacted him after observing the pepper spray.

¶48    The actual record in this case belies the Court's decision.  After Officer Kristjanson observed the pepper spray in Pearson's vehicle, Pearson was handcuffed and placed in the back of the patrol car so that the officers would be free to search his vehicle. The testimony presented at the hearing on Pearson's motion to suppress indicates that Pearson had not been placed under arrest at that point; he simply was being detained while all four officers at the scene searched his vehicle.  In fact, Officer Kristjanson testified that Pearson was not read his *Miranda* rights at that time.

¶49    It was not until after the fanny pack was searched for the second time and the officers found the bindle of methamphetamine that they decided to arrest Pearson and take him to the detention facility.  Notably, Officer Kristjanson testified to the following when questioned by the Judge:

17

Q: I think you testified that you intended to take the defendant to jail for the probation violation, that being the pepper spray; is that correct?

A: Yes, Your Honor.

Q: Do you ever do that without talking to the probation officer first?

A: *Never*, Your Honor.

Q: So at the time on the video that you're placing the defendant in handcuffs, you're detaining him for what you believe to be a probation violation?

A: Yes, Your Honor.

Q: And that's the pepper spray?

A: Yes, Your Honor.

Q: *But you would not actually transport him until you talked to the probation officer?*

A: *Correct.* [Emphasis added.]

And, Officer Pinnick testified to the following when questioned by defense counsel:

Q: Probation Officer Pinnick, when you were called by Officer Kristjanson, it's your understanding that the search of the vehicle and the fanny-pack had already occurred?

A: That's correct.

Q: Okay. So the information that was presented to you is that the officers had found methamphetamine in the defendant's fanny-pack; is that correct?

A: Correct.

Q: And so you made the consideration as to whether the officers should hold the defendant for a probation violation based on the methamphetamine and the pepper spray; is that correct?

A: *Both*, yes. [Emphasis added.]

¶50 It is clear from Officer Kristjanson's testimony that Pearson would not have been transported to the detention facility without Officer Pinnick's authorization. It is also clear from Officer Pinnick's testimony that he only authorized the probation violation hold of Pearson on the discovery of *both* the pepper spray and the methamphetamine. Consequently, it was not "inevitable" that the evidence would have been discovered during an inventory search at the detention facility because it was not until after the methamphetamine was

18

discovered that the decision was made to transport Pearson to the detention facility. Thus, the methamphetamine evidence was inadmissible because it was the product of an illegal warrantless search.

¶51　In addition, the Court points out that Officer Kristjanson testified that he had intended to detain and arrest Pearson based solely on the pepper spray violation. Opinion, ¶ 27. While that may or may not be the case, Officer Kristjanson did not arrest Pearson until *after* the discovery of the methamphetamine. The patrol car's video cam shows that several minutes after the officers searched Pearson's fanny pack for the second time, one of the officers returned to the patrol car to give Pearson the cash Pearson left in his vehicle. While the events taking place inside the patrol car are not visible on the video, the audio portion clearly indicates that after counting out the cash in front of Pearson, the officer stated: "At this time you're being placed under arrest for possession of drug paraphernalia, criminal possession of dangerous drugs—methamphetamine, and a probation violation."

¶52　As already pointed out in this Concurrence and Dissent, the inevitable discovery doctrine allows the introduction of illegally obtained evidence where the government *proves by a preponderance of the evidence* that the tainted evidence would inevitably have been discovered through lawful means. *Ellis*, ¶ 49. The State has not made the requisite showing in this case. In fact, the evidence is to the contrary.

¶53　The Court continues to emphasize Officer Kristjanson's testimony that he would have taken Pearson to the detention facility based solely on the discovery of the pepper spray. Opinion, ¶ 29. But the conduct of all of the officers is totally inconsistent with that

19

testimony. If the pepper spray alone was enough in the officers' opinion to justify Pearson's arrest, why bother to enlist additional officers to search Pearson's vehicle? Why not just arrest Pearson for the probation violation and take him to jail? Why bother to solicit Pearson's consent to search his vehicle unless the officers felt they did not yet have enough evidence to arrest him? And why, if they had already decided to arrest Pearson after finding the pepper spray, did they wait so long to read him his *Miranda* rights?

¶54    Furthermore, the Court states that after Officer Kristjanson placed Pearson in the patrol car in handcuffs, Officer Kristjanson attempted to contact Officer Pinnick "to gain permission to transport" Pearson. Opinion, ¶ 27. Why, if Officer Kristjanson intended to arrest Pearson anyway, did he need the permission of Pearson's probation officer to transport Pearson to jail?

¶55    In short, the actual record demonstrates that the methamphetamine was seized as the result of an unauthorized, and therefore, illegal, probation search. Officer Pinnick was not contacted until *after* the unauthorized search, and it is clear from his testimony that Pearson's detention was premised on the discovery of both the pepper spray and the methamphetamine. The record reflects that, based on the pepper spray alone, Pearson would *not* have been detained. In fact, Officer Kristjanson testified that he would *never* take a defendant to jail without talking to the probation officer first. Therefore, there would not have been an inventory search. The actual record plainly refutes the Court's determination to affirm the trial court.

20

¶56    Based on the foregoing, I would reverse the District Court on Issue 2, and I dissent from our failure to do so.

/S/ JAMES C. NELSON