JUSTICE MORRIS
delivered the Opinion of the Court.
¶1 Appellant Thomas Gail Pearson (Pearson) appeals from an order of the Thirteenth Judicial District Court, Yellowstone County, denying his motion to suppress and dismiss evidence. We affirm.
¶2 We review the following issues on appeal:
¶3 Whether the officers’ conduct exceeded the scope of Pearson’s traffic stop.
¶4 Whether the officers inevitably would have discovered the evidence obtained in the officers’ unwarranted second search of Pearson’s fanny pack.
FACTUAL AND PROCEDURAL HISTORY
¶5 The State of Montana (State) charged Pearson with criminal possession of dangerous drugs, criminal possession of drug paraphernalia, and operating a motor vehicle without proof of insurance. The charges stem from a routine traffic stop that led to a search of Pearson’s fanny pack and car. Officer LaMantia (LaMantia) and his field training officer, Officer Kristj anson (Kristj anson), stopped Pearson after they had observed Pearson driving with a broken tail light.
¶6 Pearson pulled into a parking lot and parked his car instead of pulling to the side of the road. The officers watched Pearson make furtive movements in the car as LaMantia approached. The officers testified that Pearson had appeared to stretch across the passenger seat. Kristjanson feared that Pearson may have been reaching for a weapon. Kristjanson also saw a “meth watch” sticker in the car window. Kristjanson testified that he knew that users of methamphetamine often put “meth watch” stickers on their cars.
¶7 When LaMantia approached the car he saw Pearson clutching a large wad of cash in his hands. LaMantia also discovered that Pearson did not have any insurance for the car and that his registration had expired. LaMantia returned to his patrol car and explained Pearson’s odd behavior to Kristjanson. Officer Kristjanson ran a search on Pearson’s license that revealed that Pearson was on probation and had a drug history.
¶8 Kristjanson approached the car and asked Pearson to put down the wad of money and step out of the car. Pearson stepped out of the car and the officers removed his fanny pack. Kristjanson patted down Pearson and searched his fanny pack for weapons. Kristjanson did not *429 find any weapons or contraband. Shortly after searching the fanny pack Kristjanson looked into Pearson’s car and saw a can of pepper spray in plain view near the driver’s seat by the center console. Kristjanson knew that probationers lawfully cannot possess a weapon, including pepper spray. Kristjanson handcuffed and detained Pearson for the probation violation and placed him in the patrol car. Kristjanson attempted to contact Pearson’s probation officer, Officer Pinnick (Pinnick).
¶9 Pearson gave the officers written consent to search his car. Officer Vickery (Vickery) assisted Kristjanson and LaMantia with the search. The officers found drug paraphernalia in Pearson’s car. Vickery also found a bindle of methamphetamine during a second search of Pearson’s fanny pack. Kristjanson reached Pinnick by telephone while still at the scene, but after the officers already had searched Pearson’s car and fanny pack. Pinnick authorized a probation violation hold on Pearson. The officers transported Pearson to the Yellowstone County Detention Facility.
¶10 Pearson moved to suppress the evidence obtained in the searches. The District Court denied Pearson’s motion to suppress. The court concluded that officer safety concerns justified the first search of Pearson’s fanny pack. The court similarly determined that Pearson’s written consent justified the officers’ search of his car. The court also held that the officers’ second search of the fanny pack constituted an unlawful search. The court declined, however, to suppress the methamphetamine found during the second search of Pearson’s fanny pack. The court determined that either a subsequent probation search authorized by Pinnick or a routine inventory search at the detention center would have led officers to discover the methamphetamine. Pearson appeals.
STANDARD OF REVIEW
¶11 We review a district court’s findings of fact for clear error and its conclusions of law for correctness to determine whether the district court correctly ruled on a motion to suppress evidence. State v. Hurlbert, 2009 MT 221, ¶ 16, 351 Mont. 316, 211 P.3d 869. This Court conducts plenary review of the district court’s application of the law. Id.
DISCUSSION
¶12 Whether the officers’ conduct exceeded the scope of Pearson’s traffic stop.
*430 ¶13 Pearson does not challenge the lawfulness of the officers’ initial investigatory stop of his car for the broken tail light. Pearson argues instead that the officers exceeded the scope of an otherwise lawful investigatory stop. An investigative traffic stop may not last longer than necessary for the officer to effectuate the purpose of the stop. Section 46-5-403, MCA; Hurlbert, ¶ 21. Additional objective data of wrongdoing that gives rise to further suspicions may enlarge the scope of a routine traffic stop. Hurlbert, ¶ 21 (citing State v. Case, 2007 MT 161, ¶ 34, 338 Mont. 87, 162 P.3d 849).
¶14 An officer stopped the defendant in Hurlbert for speeding. The officer observed that Hurlbert appeared uneasy and exhibited nervous behavior such as shaking, sweating, rapidly smoking a cigarette, and constantly moving. Hurlbert told the officer that he had been visiting his parents, but could not remember their address. The officer asked Hurlbert whether he had any illegal drugs in the car. The officer eventually obtained consent to search the car. Hurlbert argued that the officer’s questioning after the stop unlawfully had expanded the scope of the traffic stop to the point that any evidence obtained thereafter should have been suppressed. We concluded that the officer had observed sufficient additional evidence that served to enlarge the scope of the investigation and that the officer properly had questioned Hurlbert about the contents of the car. Hurlbert, ¶¶ 22-23.
¶15 Kristjanson and LaMantia testified that they had observed unusual behavior after they had stopped Pearson for a broken tail light. This unusual behavior had raised the officers’ suspicions. Pearson pulled off the road and into a parking spot instead of pulling over on the side of the road. Pearson jerked about nervously in the car and appeared to reach to the passenger seat for what Kristjanson feared might have been a weapon. Both officers saw Pearson tightly gripping a wad of cash in his hand. Kristjanson saw a “meth watch” sticker in the rear window of the car, and suspected illegal drug use. A check on Pearson’s driver license revealed that he was on probation and had a drug history.
¶16 These articulable facts obtained after the initial stop for a broken tail light supported the officers’ suspicion that Pearson might have weapons or contraband in his car. Id. at ¶ 21. This suspicion properly served to enlarge the scope of Pearson’s traffic stop and justified the officers’ additional questioning. Id. at ¶ 23.
¶17 Whether the officers inevitably would have discovered the evidence obtained in the officers’ unwarranted second search of Pearson’s fanny pack.
*431 ¶18 The Montana and U.S. Constitutions deem warrantless searches per se unreasonable unless a warrant exception applies. Hurlbert, ¶ 19. Officers do not need a warrant for an investigative stop and frisk, for an administrative post-arrest inventory search, or for a search authorized by consent. Section 46-5-401, MCA; State v. Hilgendorf, 2009 MT 158, ¶ 26, 350 Mont. 412, 208 P.3d 401; State v. Snell, 2004 MT 269, ¶ 9, 323 Mont. 157, 99 P.3d 191.
¶19 An officer may frisk a person whose car lawfully has been stopped and may take other reasonably necessary steps for protection if the officer reasonably believes that the person is armed and dangerous. Section 46-5-40l(2)(b), MCA; State v. Gopher, 193 Mont. 189, 194, 631 P.2d 293, 296 (1981). Kristjanson testified that he saw Pearson reach across the passenger seat after he had stopped Pearson’s car. Kristjanson also testified that he thought that Pearson might have been reaching for a weapon. Kristjanson frisked Pearson and searched his fanny pack for weapons for officer safety reasons. Kristjanson’s initial search of Pearson’s fanny pack constituted a lawful investigative stop and frisk. Section 46-5-401, MCA.
¶20 Kristjanson saw Pearson’s pepper spray in the front seat of his car in plain view shortly after he had conducted the investigative stop and frisk. Kristjanson knew from his check of Pearson’s license that Pearson was on probation. Kristjanson placed Pearson in handcuffs and escorted him to the patrol car. Kristjanson informed Pearson that he needed to contact Pearson’s probation officer and asked the operator for Pinnick’s phone number. Pearson then gave the officers written consent to search his car.
¶21 Pearson does not challenge whether he voluntarily consented to the search. Pearson also does not argue that the officers’ failure to Mirandize him violated his rights. Pearson argues instead that he consented only to a search of his car, and, therefore, the second search of his fanny pack constituted an unlawful search. He argues that the Court should suppress any evidence obtained from the unlawful second search.
¶22 Pearson’s written consent gave the officers permission to search only his car. Vickery conducted an unwarranted second search of Pearson’s fanny pack that revealed a bindle of methamphetamine. The officers did not have a warrant or warrant exception to support the second search of Pearson’s fanny pack. We agree with the District Court that the officers exceeded their authority when they searched Pearson’s fanny pack for a second time. The District Court concluded, *432 however, that the doctrine of inevitable discovery applied and thereby rendered admissible the evidence.
¶23 The court determined that the officers inevitably would have discovered the bindle of methamphetamine either during a search of Pearson’s fanny pack authorized by Pearson’s probation officer, or during an inventory search at the detention center after the officers had transported Pearson there for a probation violation based on the pepper spray. We do not address whether Pinnick’s “after-the-fact” authorization of a probationary search of Pearson’s fanny pack and car would have justified the unlawful search. We focus instead on whether the officers inevitably would have discovered the methamphetamine during an inventory search at the detention center after the officers had detained Pearson for the probation violation.
¶24 The exclusionary rule excludes evidence unlawfully obtained from a search without a warrant or warrant exception. Hilgendorf, ¶ 23 (citing Wong Sun v. U.S., 371 U.S. 471, 484-85, 83 S. Ct. 407, 416 (1963)); § 46-13-302, MCA. The exclusionary rule does not apply, however, if the unlawfully obtained evidence would have been discovered despite the unlawful government intrusion. Hilgendorf, ¶ 24. The Court generally applies the doctrine of inevitable discovery when investigatory procedures already were in progress and the lawful investigation eventually would have revealed the evidence. See Nix v. Williams, 467 U.S. 431, 449-50, 104 S. Ct. 2501, 2511-12 (1984). This Court has made clear that it must appear “as certainly as night follows day” that the evidence would have been discovered without reference to the violation of the defendant’s rights. Hilgendorf, ¶ 25 (citing State v. Dickinson, 2008 MT 159, ¶ 25, 343 Mont. 301, 184 P.3d 305).
¶25 The Court’s analysis in Hilgendorf proves instructive here. An officer lawfully stopped Hilgendorf s vehicle and conducted a pat-down search. Hilgendorf, ¶¶ 7,19. The officer discovered drug paraphernalia and placed Hilgendorf in handcuffs. Id. at ¶ 27. The officer conducted a second search of Hilgendorf sifter he had handcuffed Hilgendorf and discovered a small container holding crystal powder and marijuana. Id. at ¶ 7. Hilgendorf argued that the court should have suppressed the evidence obtained in the unauthorized second search.
¶26 The Court did not address whether the second search of Hilgendorf required a warrant. The Court determined instead that the officer clearly had intended to arrest Hilgendorf for possession of drug paraphernalia based on the fact that they had found drug paraphernalia and had placed Hilgendorf in handcuffs. Id. at ¶ 27. The Court concluded, therefore, that the officers inevitably would have *433 discovered the container of drugs in an inventory search at the detention center. Id.
¶27 Here Kristjanson already had discovered pepper spray in plain view and drug paraphernalia in a lawful search of Pearson’s car. Pearson consented to the officers’ search of his car. Kristjanson had placed Pearson in handcuffs, placed him in the patrol car, and attempted to contact his probation officer to gain permission to transport him, before the second search took place. Id. Kristjanson testified that he had intended to detain and arrest Pearson based solely on the pepper spray violation. Similar to the offense in Hilgendorf, Kristjanson had intended to arrest Pearson before the illegal second search of Pearson’s fanny pack. Id.
¶28 The evidence establishes that Kristjanson would have taken Pearson to the detention center and that Officer Pinnick would have authorized Pearson’s arrest based solely on the pepper spray violation or the drug paraphernalia. Officers at the detention center would have subjected Pearson to a routine inventory search at the detention center. The officers inevitably would have discovered the methamphetamine found in the second search of Pearson’s fanny pack during a routine inventory search.
¶29 The Dissent argues that the record does not support the Court’s decision. Dissent, ¶ 48. We disagree. The District Court asked Kristjanson whether he had intended to arrest Pearson based solely on the pepper spray violation:
Q. Prior to the consent to search being signed and the paraphernalia found in the vehicle, as well as the drugs found in the fanny-pack, was your intention to detain him and probably take him to the detention facility on a reported violation or a PV hold after confirming with the probation officer?
A. Yes.
Again the court asked:
Q: I think you testified that you intended to take the defendant to jail for the probation violation, that being the pepper spray; is that correct?
A: Yes, Your Honor.
¶30 The Dissent focuses on the next questions:
Q: Do you ever [transport a probationer] without talking to the probation officer first?
A: Never, Your Honor.
*434 Q: So at the time on the video that you’re placing the defendant in handcuffs, you’re detaining him for what you believe to be a probation violation?
A: Yes, Your Honor.
Q: And that’s the pepper spray?
A: Yes, Your Honor.
Q: But you would not actually transport him until you talked to the probation officer?
A: Correct.
Q. What if you hadn't-Did you ever talk to Pinnick on that night? A. Yes.
Q. And when would that have been?
A. It was sometime after placing him in the vehicle, in the patrol car.
Q. And did he say he wanted him held on a PV hold?
A. Yes, he did.
¶31 The court again asked Kristjanson what he had intended to do with Pearson immediately after he had discovered the pepper spray in plain view:
Q: And so at that point were you detaining him?
A: I was.
Q: Were you in contact with a probation officer?
A: I was.
The court then listens to the audio recording from the patrol car. Kristjanson explains that he was asking the operator to send him Pinnick’s cell phone number. This activity took place before Vickery had searched Pearson’s fanny pack. The record demonstrates that investigatory procedures already were in progress based solely on the pepper spray violation before the illegal search took place. Nix, 467 U.S. at 449-50, 104 S. Ct. at 2511-12.
¶32 The Dissent argues that because Pinnick did not authorize Pearson’s detention until after Vickery had searched the fanny pack, the inevitable discovery doctrine could not justify the search. Dissent, ¶ 50. The facts establish that Kristjanson was in the process of lawfully arresting Pearson based solely on the pepper spray violation when Vickery discovered the methamphetamine. Hilgendorf, ¶ 27. Lawful investigatory procedures that inevitably would have led to the officers’ discovery of methamphetamine in Pearson’s fanny pack were in progress when Vickery unlawfully searched the fanny pack for a second time. Nix, 467 U.S. at 449-50,104 S. Ct. at 2511-12.
*435 ¶33 Kristjanson informed Pinnick about all the violations-the pepper spray, the drug paraphernalia, and the methamphetamine-when he reached Pinnick on his cell phone. Pinnick testified that Pearson’s possession of the pepper spray alone violated the conditions of Pearson’s probation and would have justified his arrest. Pinnick authorized Pearson’s arrest based on the pepper spray, the drug paraphernalia, and the methamphetamine, however, because Kristjanson had reported everything. This fact does not contradict the notion that the pepper spray violation alone justified Pearson’s arrest.
¶34 The search of Pearson’s fanny pack is not justified by an unlawful “after-the-fact” consent. Pearson’s possession of pepper spray violated the conditions of his probation and subjected him to immediate detention. The officers had substantial evidence to detain Pearson before, and independent of, the unlawful search of Pearson’s fanny pack that revealed the bindle of methamphetamine. The evidence supports our conclusion that Pearson would have been subjected, therefore, to a routine inventory search at the detention center. The officers inevitably would have discovered the methamphetamine in Pearson’s fanny pack.
¶35 Affirmed.
JUSTICES BAKER, COTTER and WHEAT concur.