FILED

09/27/2022

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 20-0330

DA 20-0330

IN THE SUPREME COURT OF THE STATE OF MONTANA

2022 MT 185

STATE OF MONTANA,

      Plaintiff and Appellee,

  v.

BRADLEY MEFFORD,

      Defendant and Appellant.

APPEAL FROM:   District Court of the Second Judicial District,
In and For the County of Butte/Silver Bow, Cause No. DC 18-183
Honorable Kurt Krueger, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

            Chad Wright, Appellate Defender, Kristen L. Peterson, Assistant
Appellate Defender, Helena, Montana

      For Appellee:

            Austin Knudsen, Montana Attorney General, Jonathan M. Krauss,
Assistant Attorney General, Helena, Montana

            Eileen Joyce, Butte-Silver Bow County Attorney, Samm Cox, Deputy
County Attorney, Butte, Montana

      For Amici American Civil Liberties Union Foundation of Montana and
American Civil Liberties Union Foundation:

            Alex Rate, ACLU of Montana Foundation, Missoula, Montana

            Brett Max Kaufman, ACLU Foundation, New York, New York

Submitted on Briefs:  June 29, 2022

Decided:  September 27, 2022

Filed: _____

Clerk

Justice Beth Baker delivered the Opinion of the Court.

¶1      Bradley Mefford appeals his conviction of Sexual Abuse of Children in the Montana Second Judicial District Court, Butte-Silver Bow County.  Mefford asserts that the court should have suppressed the evidence his parole officer discovered when he conducted a warrantless search of Mefford's phone.  He claims the officer's search was unreasonable because it exceeded the scope of Mefford's consent and because the parole officer lacked reasonable cause to conduct the additional search.  Because the search exceeded the scope of any valid exception to the warrant requirement, we reverse.

## FACTUAL AND PROCEDURAL BACKGROUND

¶2      In November 2016, Mefford was on parole from a 2006 Flathead County conviction for Criminal Possession with Intent to Distribute, Criminal Endangerment, and Assault with a Weapon.  Mefford had been placed under the supervision of Butte Probation and Parole and was required to wear a Global Positioning System (GPS) monitor on his ankle and to adhere to a 10:00 p.m. curfew.

¶3      On November 26, 2016, Probation and Parole Officer Jake Miller observed through the GPS tracker that Mefford was in his apartment's parking lot after 10:00 p.m.  Miller, along with Mefford's supervising officer Jerry Finley, conducted a home visit on November 29, 2016, to investigate Mefford's curfew violation.  Mefford advised the officers that, because the service on his cellular phone was disconnected and he could access the internet only from his parking lot, he sat in his car to message his sixteen-year-old daughter through the Facebook Messenger application on his phone.  Miller asked to

3

see Mefford's phone so he could verify his story, and Mefford gave him permission to use it. Mefford asked his girlfriend, with whom he lived, to get his phone from upstairs and give it to Miller. Mefford gave Miller his daughter's name and told him to look for their conversation on Facebook Messenger.

¶4 Miller opened Facebook Messenger and confirmed that Mefford was telling the truth—that he in fact was engaged in a Facebook Messenger conversation, with a person bearing the name Mefford provided, at the time that Mefford violated his curfew on November 26, 2016. He believed, however, that Mefford was messaging a woman older than his daughter, based on the person's profile picture on Facebook Messenger. Without asking any other questions, Miller opened the digital photo gallery application on Mefford's phone and discovered several photos depicting what he believed was child pornography. The officers detained Mefford and seized his phone. The Board of Pardons and Parole revoked Mefford's parole and returned him to the Montana State Prison to continue serving the active portion of his 2006 sentence.

¶5 Nearly a year later, Detective Sergeant Jeff Williams obtained a search warrant for the phone.[1] Williams turned the phone over to a forensic examiner, who determined that Mefford's phone contained approximately thirty images depicting child pornography or child erotica. The examiner also conducted a forensic extraction of the phone and

---

[1] A previous search warrant was issued, but the phone had been returned to law enforcement custody without analysis. Williams testified that the reason for the delay in reapplying for a warrant was that he did not become a detective until January 2017, and Mefford's case was part of a number of "outstanding" cases he was assigned after his promotion, sometime in October 2017.

determined that the photos most likely were downloaded from a file-sharing website. In July 2018, the State charged Mefford with Sexual Abuse of Children, in violation of § 45-5-625(1)(e), MCA, for knowingly possessing a visual medium "in which a child is engaged in sexual conduct, actual or simulated."

¶6 Mefford moved to suppress the evidence and to dismiss the charge on the ground that Miller's search was unlawful because it exceeded the scope of Mefford's consent. The District Court held a suppression hearing. Miller testified that he requested permission to use Mefford's phone "to confirm his story of being on the phone." Miller said he opened the photo gallery to look for an image of Mefford's daughter and compare it to the profile picture of the person Mefford was messaging, to confirm that she actually was his daughter. Mefford testified that his consent was limited to the Facebook Messenger application: "I told him, just go to the Messenger app . . . you should be able to see the conversation and the time. . . . I consented to him opening the Messenger app for . . . my daughter, to view the conversation I was having." He added that he did not give Miller permission to search other areas of the phone; that Miller never asked him what his daughter looked like; and that Miller never asked Mefford if he could look through the photo gallery.

¶7 The District Court denied Mefford's motion, finding that Miller's warrantless search of the phone was a valid probationary search and that he did not exceed the scope of Mefford's consent when he opened the photo gallery application.[2] The case went to trial,

---

[2] In the prosecutor's affidavit for leave to file charges, he cited Miller's November 2016 discovery of photos on Mefford's phone. The affidavit also referred to information reported by Mefford's prison cellmate months after Mefford's phone was seized and he had been returned to custody for his parole revocation. There was no mention of this information at the suppression hearing, and

5

and a jury found Mefford guilty of Sexual Abuse of Children, under § 45-5-625(1)(e), MCA. The District Court sentenced Mefford to five years in the Montana State Prison, with no time suspended.

## STANDARD OF REVIEW

¶8 "We review the denial of a motion to suppress to determine whether the district court's findings of fact are clearly erroneous and whether its legal conclusions are correct." *State v. Thomas*, 2020 MT 222, ¶ 9, 401 Mont. 175, 471 P.3d 733 (citation omitted). "Findings of fact are clearly erroneous if not supported by substantial credible evidence, if the court misapprehended the effect of the evidence, or if this Court's review leaves a definite or firm conviction a mistake has been made." *Thomas*, ¶ 9 (citation omitted).

## DISCUSSION

¶9 *Whether the District Court erroneously rejected Mefford's claim that his parole officer lacked a valid exception to the warrant requirement.*

¶10 The Fourth Amendment to the United States Constitution and Article II, Section 11, of the Montana Constitution guarantee individuals the right to be free from unreasonable government searches. U.S. Const. amend. IV; Mont. Const. art. II, § 11; *State v. Peoples*, 2022 MT 4, ¶ 12, 407 Mont. 84, 502 P.3d 129; *State v. Staker*, 2021 MT 151, ¶ 10 n.9, 404 Mont. 307, 489 P.3d 489; *Thomas*, ¶ 13. Both the Fourth Amendment and Article II, Section 11, provide that no warrant shall issue absent probable cause and a particular

---

the State made no claim that the warrant was issued on any factual basis other than the photos Miller saw on the phone in November 2016. The State makes no such argument on appeal.

description of the place to be searched. U.S. Const. amend. IV; Mont. Const. art. II, § 11; *Peoples*, ¶ 15.

¶11 Apart from Article II, Section 11, and its federal counterpart, the Montana Constitution provides an express right to individual privacy against government intrusion. Mont. Const. art. II, § 10; *State v. Smith*, 2021 MT 324, ¶ 12, 407 Mont. 18, 501 P.3d 398. Article II, Section 10, states that "[t]he right of individual privacy . . . shall not be infringed without the showing of a compelling state interest." Mont. Const. art. II. § 10. "Together, Article II, Sections 10-11, provide a heightened state right to privacy, broader where applicable than the privacy protection provided under the Fourth and Fourteenth Amendments to the United States Constitution." *Staker*, ¶ 9 (citations omitted).

¶12 A "search" occurs, within the meaning of the United States and Montana Constitutions, when "government action intrudes or infringes upon an individual's reasonable expectation of privacy." *Staker*, ¶ 10; *see also United States v. Jacobsen*, 466 U.S. 109, 113, 104 S. Ct. 1652, 1656 (1984). A "reasonable expectation of privacy" exists when "an individual has [(1)] a subjective expectation of privacy that is [(2)] objectively reasonable in society." *Staker*, ¶ 11 (citing *Katz v. United States*, 389 U.S. 347, 361, 88 S. Ct. 507, 516 (1967) (Harlan, J., concurring)) (other citations omitted). "Whether an individual had a subjective expectation of privacy, and whether such expectation was objectively reasonable in society, are mixed questions of fact and law under the totality of the circumstances of each case." *Staker*, ¶ 11 (citations omitted). If an individual demonstrates a reasonable expectation of privacy, thus triggering the protections of Article II, Sections 10 and 11, we turn to the nature of the State's intrusion

7

to determine whether the search was "reasonable under the circumstances." *State v. Goetz*, 2008 MT 296, ¶ 38, 345 Mont. 421, 191 P.3d 489.

¶13    Whether an individual had an actual, subjective expectation of privacy depends on various factors, including "the nature and circumstances of the location and setting at issue and the extent to which the subject overtly or implicitly assumed, considered, desired, or endeavored to ensure that the subject activity or information would remain concealed or undisclosed to others." *Staker*, ¶ 21 (citations omitted); *see also Goetz*, ¶ 29 ("What a person knowingly exposes to the public is not protected, but what an individual seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected.") (citations omitted). The determination necessarily depends on "the particular facts of the case." *Goetz*, ¶ 29.

¶14    Mefford maintains he had a subjective expectation of privacy in his phone's digital photo gallery because of the vast quantity of personal information it contained. Mefford manifested this expectation when he gave Miller permission to open Facebook Messenger on his phone and told him what conversation to read. Miller implicitly recognized Mefford's expectation of privacy by asking for permission to see his phone. The State does not dispute that Mefford had a subjective expectation of privacy in his photos. We agree.

¶15    The State similarly does not dispute Mefford's argument that his expectation of privacy was objectively reasonable. We have recognized a reasonable expectation of privacy in cell phone communications. *See, e.g., State v. Stewart*, 2012 MT 317, ¶ 42, 367 Mont. 503, 291 P.3d 1187; *State v. Allen*, 2010 MT 214, ¶ 57, 357 Mont. 495, 241 P.3d 1045 ("society is willing to recognize as reasonable the expectation that private

8

cell phone conversations are not being surreptitiously monitored and recorded by government agents"). Cell phones have become storage devices for all manner of private information. As Amici highlight, "[a] smartphone is a palm-sized portal into an individual's personal life," which may contain up to "250,000 personal photos" and information about a person's "health and activity, dating, video streaming, mobile shopping, banking, and password storage." The United States Supreme Court recognized the unique privacy implications of modern cell phones in *Riley v. California*:

> [A] cell phone search would typically expose to the government far *more* than the most exhaustive search of a house: A phone not only contains in digital form many sensitive records previously found in the home; it also contains a broad array of private information never found in a home in any form.

573 U.S. 373, 396-97, 134 S. Ct. 2473, 2491 (2014) (emphasis in original) (holding that police may not search the contents of a cell phone without a warrant and that the search incident to arrest exception did not apply to the photos and videos on the defendant's phone). *See also State v. Neiss*, 2019 MT 125, ¶ 58, 396 Mont. 1, 443 P.3d 435, (analogizing a computer to a "container—for example a filing cabinet[] . . . capable of storing vast amounts of documents"). We agree with Mefford that his expectation of privacy in the information stored on his cell phone is one society recognizes as objectively reasonable. Miller's action of accessing and viewing the contents of Mefford's phone thus constituted a government search, triggering constitutional protections.

¶16 We consider the nature of the State's intrusion to determine whether the search was reasonable under the circumstances. To be reasonable, the government intrusion must be justified by a compelling state interest and supported by "procedural safeguards such as a

9

properly issued search warrant" or a warrant exception. *Goetz*, ¶ 27; *see also Staker*, ¶ 13. Warrantless searches are "*per se* unreasonable except under certain recognized and narrowly delineated exceptions to the warrant requirement." *Peoples*, ¶ 15 (citations omitted). "[B]ased on the heightened individual right to privacy under Article II, Section 10, the government must generally utilize the least intrusive means available to effect a warrantless search under a recognized exception to the warrant requirement of Article II, Section 11." *Staker*, ¶ 12 (citations omitted). We have recognized "only a few 'specifically established and well-delineated'" exceptions to the Article II, Section 11 search warrant requirement, *Nichols v. DOJ*, 2011 MT 33, ¶ 20, 359 Mont. 251, 248 P.3d 813 (quoting *State v. Loh*, 275 Mont. 460, 468, 914 P.2d 592, 597 (1996)), including, as pertinent here, the "consent" and "probation search" exceptions. *See Peoples*, ¶ 17; *State v. Dupree*, 2015 MT 103, ¶ 19, 378 Mont. 499, 346 P.3d 1114.

¶17    Mefford does not dispute the State's compelling interest in the supervision of probationers and parolees but argues that the State lacked a valid warrant exception to search his phone beyond the messages needed to confirm his explanation. The State contends that Miller's search was reasonable because it was justified by the "consent" and "probation search" exceptions to the warrant requirement.

*Consent*

¶18    Consent to search "is a recognized exception to the warrant requirement." *State v. Snell*, 2004 MT 269, ¶ 9, 323 Mont. 157, 99 P.3d 191. To qualify as a valid exception, consent must be "given knowingly and voluntarily by an individual with the ability to consent." *State v. Parker*, 1998 MT 6, ¶ 20, 287 Mont. 151, 953 P.2d 692. "When an

10

official search is properly authorized—whether by consent or by the issuance of a valid warrant—the scope of the search is limited by the terms of the authorization." *State v. Graham*, 2004 MT 385, ¶ 22, 325 Mont. 110, 103 P.3d 1073 (quoting *Walter v. United States*, 447 U.S. 649, 656-57, 100 S. Ct. 2395, 2401-02 (1980)); *see also Florida v. Jimeno*, 500 U.S. 248, 251, 111 S. Ct. 1801, 1804 (1991) ("The scope of a search is generally defined by its expressed object."). Whether the search came within the terms of authorization is a question of "objective reasonableness." *Parker*, ¶ 21. We ask whether the state actor could have "reasonably . . . understood" an individual's consent "to extend to a particular" area. *Parker*, ¶¶ 21-22.

¶19 We held in *Parker*, ¶¶ 21-22, that a person's consent to search a vehicle authorized the police to search containers within the vehicle. There, an officer initiated a traffic stop, suspecting that the occupants of the vehicle possessed "weapons, drugs, or drug paraphernalia." *Parker*, ¶ 5. The owner of the vehicle gave consent when the officer asked to search the vehicle; the district court concluded that the owner "did not limit the scope of the search." *Parker*, ¶¶ 5, 17. The officer opened a purse located on the passenger floor, where he found drugs and drug paraphernalia. *Parker*, ¶ 7. He also discovered a fanny pack in the rear deck of the vehicle, of which all occupants denied ownership. *Parker*, ¶ 8. The officer then searched the fanny pack and discovered more drugs and drug paraphernalia. *Parker*, ¶ 9. We concluded that it was objectively reasonable for the officer to believe that the owner's consent to search the vehicle extended to closed items inside the vehicle as well. *Parker*, ¶ 22.

11

¶20 We held in *State v. Pearson*, by contrast, that a defendant's consent to search his vehicle did not extend to his fanny pack, which was on his person outside the vehicle. 2011 MT 55, ¶ 22, 359 Mont. 427, 251 P.3d 152. Pearson was on probation when an officer extended a traffic stop upon suspicion of drug activity. *Pearson*, ¶¶ 5-8. The officer initially conducted a lawful pat-down and searched his fanny pack but did not discover any contraband. *Pearson*, ¶ 8. Pearson subsequently consented to a search of his vehicle, and the officers searched his fanny pack a second time, where they discovered methamphetamine. *Pearson*, ¶ 9. We held that, because Pearson consented only to a search of his vehicle, the officers exceeded the scope of his consent when they searched the fanny pack a second time. *Pearson*, ¶ 22. We affirmed the district court's denial of Pearson's suppression motion, however, on the doctrine of inevitable discovery. *Pearson*, ¶ 34.

¶21 Mefford argues that Miller's search of his photos exceeded the scope of his consent, which he limited to only one conversation on Facebook Messenger. He contends that the search of a cell phone is quantitively and qualitatively unique in this context because a person can switch from one application to another within a few seconds and with the tap of a screen. This, he asserts, is the physical equivalent of searching through a person's mail, bedroom, place of business, storage facility, vehicle, and call records. Traditional scope-of-consent principles, therefore, while instructive, do not fully account for the differences between physical searches and digital searches. The State argues that substantial evidence supports the court's finding that Mefford consented to a search of the entire phone and not to only a specific application.

¶22    Based on the testimony at the suppression hearing, we agree with Mefford that Miller's search of his photos exceeded the scope of his consent. Both Mefford's and Miller's testimonies indicate that the purpose of the search was to confirm that Mefford was on his phone when he said he was. Miller testified:

> I asked the defendant if I could view the phone *to confirm his story of being on the phone*. The reason for that is, besides trying to contact the defendant that prior weekend about him being in the parking lot, I tried to call the cell phone number that he had provided, and it said it was disconnected.
>
> .   .   .
>
> The defendant gave me consent to view the phone. And I did confirm there were messages at that time frame like the defendant said.
>
> The photo of the person sending the message didn't appear to be his daughter; didn't appear to be a younger female like he had described.

(Emphasis added.) Miller admitted that he asked to view Mefford's phone to confirm that he was on the phone when he said he was and that he did in fact confirm that Mefford was on the phone. Mefford's testimony was consistent with Miller's understanding of the scope of the search:

> I said, look, I can verify when I was out past curfew, okay? I mean, *I was talking to my daughter through Messenger on my phone*, and I had to go a little bit outside my house and sit in my car to pick up wifi, you know, to use the Messenger app. I said, look, *I can verify the time and the date*, and I don't have a problem with that, you know.
>
> .   .   .
>
> I told [my girlfriend], hey, can you go upstairs and grab the phone for me so I can show him the messages from the time and date that was of concern.
>
> She did. She went and got the phone. She handed it to him.

13

I told him, *just go to the Messenger app*; her name is [F.]; and, you should be able to see the conversation and the time.

(Emphasis added.) Mefford's testimony clearly corroborates Miller's: Mefford agreed to give Miller his phone so he could confirm that Mefford was on the phone at the time of his curfew violation. Miller said his purpose in asking for the phone was to "confirm [Mefford's] story of being on the phone," and Mefford said the purpose was to "verify when [he] was out past curfew," "verify the time and the date," and to "see the conversation and the time." There was no discussion about confirming the identity of Mefford's daughter or about accessing any different applications on Mefford's phone. Based on their consistent testimonies, Miller and Mefford discussed only a search of the phone limited to confirming that Mefford was using it at the time he violated curfew. The record does not substantiate the District Court's finding that Mefford gave Miller blanket approval to search the contents of his phone.

¶23 Based on the circumstances of the interaction between Mefford and the officers, Miller could not have "reasonably . . . understood" Mefford's consent to extend to his digital photo gallery. *See Parker*, ¶ 21. It was no more reasonable for Miller to believe that he had permission to search Mefford's photos to corroborate the identity of his daughter than it would have been for him to search through a photo album in Mefford's bedroom or a rolodex on Mefford's office desk for information regarding Mefford's daughter. Each of those searches similarly would not have been permitted by Mefford's consent. The terms of Mefford's authorization limited Miller's search to "look at the conversation" with Mefford's daughter—a specific purpose—and it was not objectively

14

reasonable for Miller to believe that Mefford's consent extended to other areas of the phone. The District Court's finding was clearly erroneous.

¶24 Our holding in *Parker* is distinguishable both because of the facts of that case and because of the unique privacy implications of cell phones. In *Parker*, the owner did not limit the scope of her consent when the officer asked to search the vehicle, and it was objectively reasonable for the officer to believe that the owner's consent extended to smaller compartments within the vehicle. *See Parker*, ¶¶ 5-8. Mefford, unlike the vehicle owner in *Parker*, directed his consent to one application on his phone—equivalent to consenting to a search of an item or container within a vehicle. Mefford told Miller to "go to the Messenger app," where he "should be able to see the conversation and the time." Unlike the situation in *Parker*, Mefford's consent reasonably did not extend to other areas of his phone. The limited capacity of a fanny pack or even a vehicle, moreover, is not comparable to the vast storage capabilities of a modern cell phone or cell phone application, thus rendering this a unique case. By searching a cell phone, an officer can discover highly sensitive and private information about the owner of the phone and every person with whom the owner associates. Such information is not ordinarily discoverable during the search of a vehicle or its contents.

¶25 The situation here is more comparable to *Pearson*, where the defendant consented to a search of his vehicle but not to his fanny pack. *Pearson*, ¶¶ 8-9. It was objectively reasonable for both Pearson and the officer to expect that Pearson's consent to search his vehicle did not include permission to search his fanny pack, which he wore on his person. Similarly, when Mefford authorized Miller to read his conversation on Facebook

15

Messenger, he could not have expected that his consent extended to browsing the photo gallery on his phone, nor was it reasonable for Miller to think it did.

¶26 Relevant to this discussion is the scope of a search pursuant to a valid search warrant. Clearly, a search conducted pursuant to a warrant is not per se unreasonable; but we have stated that the scope of the search similarly is limited "by the terms of the authorization." *Graham*, ¶ 22. *See also United States v. Strickland*, 902 F.2d 937, 941 (11th Cir. 1990) ("The scope of the actual consent restricts the permissible boundaries of a search in the same manner as the specifications in a warrant."). We held in *Graham* that authorization to search the defendant's garage pursuant to a search warrant did not extend to a search of his home. *Graham*, ¶ 27. There, officers obtained a search warrant for the defendant's property based on probable cause that the defendant was operating a clandestine methamphetamine laboratory inside an unattached garage on his property. *Graham*, ¶¶ 8-9. The search of the garage yielded no evidence, but the officers found a methamphetamine laboratory in the defendant's home, which they also searched pursuant to the same warrant. *Graham*, ¶ 10. We rejected the State's assertion that, based on a "reasonable inference," the officers believed they were authorized to search the defendant's home for contraband. *Graham*, ¶ 22. We concluded that the officers' search of the defendant's home exceeded the scope of their expressed authorization to search the garage pursuant to the search warrant. *Graham*, ¶¶ 26-27.

¶27 Our holding in *Graham* is analogous to the case before us. In *Graham*, the search warrant limited the scope of the search to a specific physical location, and the officers exceeded the parameters of the warrant when they searched a separate structure on the

16

defendant's property. *Graham*, ¶¶ 8-9, 22. Though here we are dealing with digital, not physical, "locations," the scope of Mefford's consent similarly was limited. Just as in *Graham*, where it was unreasonable for the officers to believe that the warrant implicitly authorized them to search other structures on the defendant's property, it was unreasonable for Miller to infer that he had permission to access other applications on Mefford's phone.

¶28 Other jurisdictions considering the search of electronic devices have scrutinized the extent of the owner's consent to determine the permissible scope of the search. *See, e.g.*, *United States v. Lopez-Cruz*, 730 F.3d 803, 811 (9th Cir. 2013) (holding that consent to search a cell phone does not extend to answering incoming calls on the cell phone); *Wisconsin v. Jereczek*, 961 N.W.2d 70, 72 (Wis. Ct. App. 2021) (forensic extraction of computer's hard drive exceeded the scope of defendant's consent, which was limited to a search of only his son's user account); *Maine v. Bailey*, 989 A.2d 716, 725 (Me. 2010) (consent to search a computer for the purpose of determining whether someone was impermissibly gaining access to it did not extend to a search of the defendant's videos on the computer); *Illinois v. Prinzing*, 907 N.E.2d 87, 99 (Ill. App. Ct. 2009) (where detective limited search of a computer to "viruses," searching for images on the computer exceeded the scope of the defendant's consent). These cases, like the case before us, are distinguishable from cases in which defendants signed general consent forms to search all the contents of, e.g., a cell phone or a computer. *See, e.g.*, *United States v. Gallegos-Espinal*, 970 F.3d 586, 591-92 (5th Cir. 2020) (upholding the warrantless search of a phone where the defendant signed a consent form authorizing a "complete" search of his iPhone); *United States v. Thurman*, 889 F.3d 356, 368-69 (7th Cir. 2018) (upholding a

17

forensic search of the defendant's phone, where the defendant gave "unlimited" consent to search the phone).

¶29 These cases, like our analogous precedent, demonstrate that whether an officer exceeds the scope of consent in a cell phone search must be determined on a case-by-case basis, under the standard of objective reasonableness we have applied in similar cases. *See Parker*, ¶ 21. On the suppression hearing record in this case, we conclude that Mefford's consent to search Facebook Messenger for the limited purpose of confirming that he was on the phone during his curfew violation did not give Miller permission to access Mefford's digital photo gallery on his phone. Miller's excursion into other areas of the phone exceeded the scope of Mefford's consent under Article II, Sections 10 and 11, of the Montana Constitution.

***Probation Search***

¶30 The District Court held in the alternative that Miller's search was a permissible probation search. The State reasserts that argument on appeal.

¶31 The Department of Corrections (DOC) supervises probationers and parolees. Sections 46-23-1001(4), -1002(1)-(4), -1012, -1021(1), MCA. The DOC may "adopt rules for the conduct of persons placed on parole." Section 46-23-1002(3), MCA. "At any time during the release on parole," probation and parole officers are authorized to "arrest . . . the parolee for violation of any of the conditions of release or a notice to appear to answer to a charge of violation." Section 46-23-1023(1), MCA. Pursuant to the DOC's regulations, parolees are subject to the same search requirements as probationers. *See* Admin. R. M. 20.7.1101 (2008).

18

¶32 Parolees are subject to warrantless searches of their homes and property when: (1) "such searches are generally authorized by an established state law regulatory scheme that furthers the special government interests in rehabilitating probationers and protecting the public from further criminal activity by ensuring compliance with related conditions of probation and the criminal law"; (2) the probation officer has reasonable cause to suspect that the probationer may be in violation of the probationer's conditions of supervision or the criminal law; and (3) "the warrantless search is limited in scope to the reasonable suspicion that justified it in the first instance except to the extent that new or additional cause may arise within the lawful scope of the initial search." *Peoples*, ¶ 17.

¶33 Regarding the first requirement of the exception, Mefford does not dispute that he was supervised by Probation and Parole at the time of the search. The DOC authorizes searches of parolees pursuant to Admin. R. M. 20.7.1101(7)-(8) (2008):

> Upon reasonable suspicion that the offender has violated the conditions of supervision, a probation and parole officer may search the person, vehicle, and residence of the offender, and the offender must submit to a search.
>
> .   .   .
>
> The offender must comply with all municipal, county, state, and federal laws and ordinances and shall conduct himself/herself as a good citizen.

¶34 Regarding the second requirement, the "reasonable cause" standard is "substantially less than the probable cause standard required by the Fourth Amendment because of the probationer's diminished expectation of privacy." *State v. Burchett*, 277 Mont. 192, 195-96, 921 P.2d 854, 856 (1996); *see also State v. Moody*, 2006 MT 305, ¶ 12, 334 Mont. 517, 148 P.3d 662. At a minimum, however, it "require[s] some specific and

19

articulable factual basis known to the probation officer upon which to reasonably suspect, based on the probationer's criminal and probation compliance history and the officer's knowledge of his or her life, character, and circumstances, that the probationer may be in possession of contraband in violation of his or her probation or the criminal law." *Peoples*, ¶ 18 (citing *State v. Fischer*, 2014 MT 112, ¶¶ 10-17, 374 Mont. 533, 323 P.3d 891) (other citations omitted).

¶35 Under the third requirement, the scope of the search must be limited "to the reasonable suspicion that justified it in the first instance except to the extent that new or additional cause may arise within the lawful scope of the initial search." *Peoples*, ¶ 17. The officer's suspicion cannot be a generalized suspicion of wrongdoing; "the decision to search must be based on 'specific facts.'" *Peoples*, ¶ 18 (quoting *United States v. Hill*, 967 F.2d 902, 910 (3d Cir. 1992)).

¶36 Mefford does not dispute that Miller had reasonable cause to suspect that he violated curfew on November 26, 2016. He argues, however, that Miller did not reasonably suspect that Mefford was in possession of contraband on his phone and that he therefore exceeded the scope of his search when he opened another application. The State argues that Miller's suspicion that Mefford was out past curfew gave him the authority to search Mefford's phone based on the "flexibility" of supervisory powers that probation officers possess.[3]

---

[3] The State argues also that Mefford did not preserve this argument for appeal because his motion to suppress was based solely on the assertion that Miller exceeded the scope of Mefford's consent. Though we do not permit parties to raise new issues or change their legal theories on appeal, "[w]e of course permit parties to bolster their preserved issues with additional legal authority or to make further arguments within the scope of the legal theory articulated at trial." *State v. Strizich*, 2021 MT 306, ¶ 32, 406 Mont. 391, 499 P.3d 575 (citations and alterations omitted). Mefford

¶37 The parties agree that Miller and Finley went to Mefford's home on November 29, 2016, to investigate a potential parole violation based on their suspicion that Mefford violated curfew three days earlier. That suspicion was based on Mefford's GPS ankle monitor, which indicated that Mefford was in his apartment parking lot after 10:00 p.m. Upon questioning Mefford, the officers learned that he in fact had been out past curfew. Mefford admitted to the officers that he violated his curfew, but he claimed it was because he was communicating with his sixteen-year-old daughter, who resided in California, through Facebook Messenger. To substantiate his account, Mefford agreed to the officers' review of his recent Facebook Messenger history. At that point, the officers' suspicion was confirmed: Mefford violated a condition of his parole by leaving his apartment after 10:00 p.m. on November 26, 2016. The District Court concluded that Miller had reasonable cause to look further once the profile picture raised questions about whether Mefford was conversing with his daughter or with someone else.

¶38 Probationers and parolees "have significantly diminished subjective and objective expectations of privacy." *Peoples*, ¶ 17. Mefford does not dispute that his expectation of privacy was diminished, as he was subject to the supervision of the DOC. Even the search of a probationer with a diminished expectation of privacy, however, "is limited in scope to

---

argued that the State violated his Fourth Amendment and Article II, Sections 10 and 11 rights by conducting an illegal search of his phone. The burden then shifted to the prosecution to "prove that the search c[ame] within a recognized exception to the warrant requirement." *State v. Heath*, 2000 MT 94, ¶ 18, 299 Mont. 230, 999 P.2d 324. It was not Mefford's burden to preemptively refute every possible warrant exception the State might raise to justify its warrantless search. The District Court's Order, moreover, contradicts the State's assertion that Mefford did not raise this argument until now: "The Defense argues that even under a probationary search a warrant was required to search the phone because a cell phone does not fall under the resident, person, or vehicle requirement." Mefford's argument on appeal thus is properly preserved.

the reasonable suspicion that justified it in the first instance," unless new or additional cause arises "within the lawful scope of the initial search." *Peoples*, ¶ 17. Without Mefford's consent, in order to conduct an additional search of Mefford's digital photo gallery, Miller needed "reasonable cause" to expand the search. But Miller did not identify a "specific and articulable factual basis" upon which to suspect that Mefford had violated the criminal law or a condition of his parole. *See Peoples*, ¶ 18. Miller's initial reason for searching Facebook Messenger ("to confirm [Mefford's] story of being on the phone") no longer provided an articulable basis to search because he already confirmed that Mefford was on the phone when he said he was. The only reason Miller gave for searching Mefford's photos was that he wanted to confirm that the person with whom Mefford was communicating was his daughter. Aside from this being unrelated to Mefford's admitted curfew violation, Miller articulated nothing about Mefford's alleged daughter's profile picture that gave rise to further suspicion of a crime or a parole violation. Miller believed that the person with whom Mefford was communicating was "too old" to be Mefford's daughter. He did not suspect that Mefford was engaged in an inappropriate conversation with a minor over Facebook Messenger. Miller identified nothing within the substance of Mefford's Facebook Messenger conversation that alerted him to the possibility of a crime or a suspected parole violation that could be substantiated by viewing Mefford's digital photo gallery. Miller likewise did not connect the additional search to Mefford's criminal history, Mefford's parole compliance history, or the circumstances of the curfew violation. *See Peoples*, ¶ 18. And finally, Miller did not identify any "new or additional" cause that

22

would amount to a "specific and articulable factual basis" to search further. *See Peoples*, ¶ 18.

¶39 The State asserts that Miller had reasonable cause to suspect that Mefford violated his curfew and therefore reasonably suspected that Mefford was involved in "suspicious activity." Miller said no such thing. Neither the "circumstances" of the parole violation nor Mefford's "criminal and probation compliance history" gave rise to a suspicion that Mefford possessed contraband of the kind discovered on his phone. *See Peoples*, ¶ 18. And a "generalized suspicion" or an "undeveloped hunch" of suspicious activity is never sufficient to supply a "specific and articulable factual basis . . . upon which to reasonably suspect" that a crime has been committed. *Peoples*, ¶ 18; *State v. Reeves*, 2019 MT 151, ¶¶ 11-13, 396 Mont. 230, 444 P.3d 394; *State v. Hoover*, 2017 MT 236, ¶¶ 18-19, 388 Mont. 533, 402 P.3d 1224. Mefford's substantiated curfew violation did not provide an articulable factual basis for a search of Mefford's photos.

¶40 The State cites *State v. Burke*, 235 Mont. 165, 766 P.2d 254 (1988), for the proposition that probation officers have "flexibility" in supervising parolees, and therefore Mefford's suspicious behavior authorized Miller to exceed the scope of the initial probation search. In *Burke*, an officer observed "various persons leave [a] bar," walk to the defendant's car, which the defendant occupied, and return to the bar. 235 Mont. at 166, 766 P.2d at 255. When he approached the defendant, the officer noticed the odor of marijuana and saw cigarette rolling papers in plain view. *Burke*, 235 Mont. at 166, 766 P.2d at 255. The defendant was on probation, and his probation officer gave the officer permission to search the vehicle, where the officer discovered marijuana. *Burke*,

23

235 Mont. at 166-67, 766 P.2d at 255. The probation officer then gave the officer permission to search the defendant's house, pursuant to Admin. R. M. 20.7.1101(11) (1978), which permitted the warrantless search of a probationer's house upon "reasonable cause." *Burke*, 235 Mont. at 167, 169-70, 766 P.2d at 255, 257. We held that the search of the defendant's home was lawful under the probation search exception to the warrant requirement. *Burke*, 235 Mont. at 171, 766 P.2d at 258. We rejected the defendant's argument on appeal that a standard more stringent than "reasonable grounds" should apply, based, in part, on the "degree of flexibility [that] must be accorded the probation officer," considering the probation officer's "knowledge," "expertise," and "continued experience" with the probationer/parolee. *Burke*, 235 Mont. at 168-69, 766 P.2d at 256.

¶41 *Burke* does not elevate the "flexibility" of probation officers to a stand-alone warrant exception. On the contrary, it is consistent with our holding here. In *Burke*, the probation officer had reasonable cause to believe that the defendant violated a condition of supervision by possessing marijuana, which authorized the probation officer to order a search of the defendant's home. The scope of the search was limited to the reasonable suspicion that justified the initial search (i.e., that the defendant possessed marijuana). It was reasonable to assume that the defendant would possess marijuana in his home as well as in his vehicle. Here, by contrast, Miller had reasonable cause that Mefford violated his curfew. His reasonable cause was confirmed when Mefford admitted that he violated his curfew. His search of Facebook Messenger corroborated Mefford's story that Mefford was on his phone during his curfew violation. At that point, Miller's initial articulable suspicion (that Mefford violated his curfew) no longer was relevant to his subsequent search of

24

Mefford's photos. Nothing that Miller reasonably could have expected to discover in Mefford's photos would have provided further evidence of a curfew violation, nor would it have confirmed or dispelled his suspicion that Mefford violated his curfew on November 26, 2016, or anything else Miller reasonably suspected from the new information he learned. The facts of *Burke* thus are distinguishable from the present case.

¶42    In short, a probation and parole officer's flexibility to supervise probationers with a diminished expectation of privacy does not vitiate the requirements for a probation search exception. *See Peoples*, ¶ 17 (explaining the three elements of the probation search exception). There are many cases affirming the warrantless search of a probationer that illustrate the proper exercise of a probation officer's supervisory flexibility. In these cases, the scope of the search was within the articulable factual basis that gave rise to the officer's initial reasonable cause or was properly extended after the officer learned new information "within the lawful scope of the initial search." *Peoples*, ¶ 17. *See, e.g., State v. Conley*, 2018 MT 83, ¶¶ 3-6, 25, 391 Mont. 164, 415 P.3d 473 (upholding a warrantless search of the defendant-probationer's vehicle based on reasonable cause that the defendant was in possession of drugs because the defendant was on probation for a drug offense, admitted to prior methamphetamine use, had multiple other probation violations, and admitted that he had been awake all night); *Fischer*, ¶¶ 2-6, 17 (upholding a warrantless search of the defendant's purse for narcotic pills because the defendant was on probation for a drug offense, admitted that her pill count was "off," and failed to report it to Probation and Parole as required by her conditions of supervision); *State v. Charlie*, 2010 MT 195, ¶¶ 25-26, 357 Mont. 355, 239 P.3d 934 (upholding a warrantless probation search of a

25

vehicle where the defendant ran a stop sign, appeared nervous, spoke rapidly, and was observed reaching around the inside of the car during the traffic stop); *State v. Fritz*, 2006 MT 202, ¶¶ 4-7, 11, 333 Mont. 215, 142 P.3d 806 (upholding a probation search of the defendant's vehicle after the defendant drove to a residence where officers discovered evidence of drug use and drug paraphernalia, and the owner of the residence informed them that the defendant possessed chemicals commonly used in the manufacture of methamphetamine); *State v. Stone*, 2004 MT 151, ¶¶ 8-10, 42, 321 Mont. 489, 92 P.3d 1178 (upholding a warrantless search of the defendant's home under the probation search exception, where officers received a report that there were "dead" and "dying" animals on the defendant's property, and where officers observed dead rabbits in cages around the defendant's home); *State v. Roper*, 2001 MT 96, ¶¶ 6-7, 19, 305 Mont. 212, 26 P.3d 741 (upholding a probation search of the defendant's home where the defendant was on probation for selling drugs, two probationers reported that the defendant was still using and selling drugs, and the probation officer learned that a drug task force was investigating the defendant for drug distribution); *State v. Beaudry*, 282 Mont. 225, 226-27, 231, 937 P.2d 459, 460, 462 (1997) (upholding a probation search of the defendant's home on the ground that the probation officer had reasonable cause to suspect the defendant possessed contraband after the defendant tested positive for illicit drugs four times, admitted that he consumed alcohol, frequented bars, and possessed stolen firearms); *State v. Burchett*, 277 Mont. 192, 194-95, 197, 921 P.2d 854, 855, 857 (1996) (upholding a probation search where the probation officer suspected that the defendant burglarized his place of previous employment because the manager reported that it was an "inside job"

26

and that another employee witnessed firearms and the stolen merchandise in the defendant's home); *State v. Boston*, 269 Mont. 300, 302-03, 305, 889 P.2d 814, 815-17 (1994) (upholding a warrantless search of a parolee's residence and storage garage when the parole officer learned of evidence linking the defendant to an arson fire); *State v. Hall*, 249 Mont. 366, 816 P.2d 438 (1991) (holding that a probation officer had reasonable cause to search the defendant's home pursuant to the probation search exception because an informant advised the drug task force that the defendant was selling drugs, and an undercover detective subsequently notified the probation officer that he purchased drugs from the defendant's residence); *State v. Small*, 235 Mont. 309, 310-12, 767 P.2d 316, 317-18 (1989) (upholding a probation search of the defendant's home after the probation officer received a tip from a confidential informant that the defendant, who was on probation for a drug conviction, was selling marijuana at her residence).

¶43    Each of these cases reveals specific facts upon which the officer reasonably suspected violations of probation or the criminal law. In sharp contrast, nothing that Miller expected to discover in Mefford's photo gallery had any connection to the initial crime that landed him on parole or to the admitted curfew violation that Miller and Finley were investigating. Mefford was paroled on drug and assault convictions, not for sex crimes or crimes involving minors. The contents of his photo gallery bore no relation to the reasons for his parole. Miller did not articulate any suspicion that Mefford was conversing with a prostitute, with someone younger than his daughter, or that Mefford's Facebook Messenger conversation revealed evidence of some other crime or some other parole violation.

27

Miller's stated purpose thus exceeded "the suspicion that justified [the search of Mefford's phone] in the first instance." *See Peoples*, ¶ 17.

¶44   The Dissent posits that the officers had reasonable suspicion that Mefford was lying about the identity of the person with whom he was communicating and may have committed an additional parole violation by drinking. Dissent, ¶¶ 54-56. First though, Officer Finley did not testify at the suppression hearing, and Miller said nothing at the hearing about any additional suspected violations. Second, even if Miller may have had a reasonable suspicion that Mefford was not being truthful about who he had been texting, Miller did not explain how randomly scrolling through the photos in Mefford's private cell phone photo gallery could provide evidence confirming his suspicion. It was, furthermore, unreasonable for Miller to assume that, by engaging in a generalized scrolling through Mefford's photos, he could confirm the identity of Mefford's daughter without: (a) knowing what Mefford's daughter looked like; (b) asking Mefford if he had pictures of his daughter on his phone; (c) knowing whether Mefford's daughter used her own photograph as her profile picture on Facebook; or (d) considering that, even if Mefford had personal photos that matched the profile picture of the person with whom he was communicating on Facebook, it still would not confirm whether she actually was Mefford's daughter. Miller did not ask any such questions or seek additional information to ascertain whether Mefford was lying. The expedition into Mefford's photo gallery had no connection to Mefford's curfew violation or to any new reasonable cause that Miller articulated and was otherwise unconnected to Mefford's "criminal history," "[parole] compliance history," or "[Miller's] knowledge of [Mefford's] life, character, and circumstances." *See Peoples*, ¶ 18.

28

¶45 Had Mefford been communicating with a younger child through Facebook Messenger; had Mefford's Facebook Messenger conversation revealed that he was having an inappropriate conversation with his "daughter"; or had Miller seen evidence of some other crime, such as prostitution or the sale of drugs, this would be a completely different case, and Miller almost certainly would have had new reasonable cause to conduct an additional search. Similarly, had Mefford been on parole for a sex crime or for abuse of children, those facts could cast the circumstances of Miller's search under a different light. But those facts are not before the Court in this appeal. On this record, we conclude that Miller's warrantless search of Mefford's digital photo gallery was not a valid probation search under Article II, Sections 10 and 11, of the Montana Constitution.

*Application of Exclusionary Rule*

¶46 Pursuant to the exclusionary rule, "evidence discovered as the result of a constitutionally invalid search or seizure is generally inadmissible against the accused in subsequent proceedings." *State v. Zeimer*, 2022 MT 96, ¶ 54, 408 Mont. 433, 510 P.3d 100 (citations omitted). The purpose of the rule is to "deter illegal police conduct and to preserve judicial integrity." *State v. Long*, 216 Mont. 65, 71, 700 P.2d 153, 157 (1985). The State bears the burden of proving that an exception to the exclusionary rule applies. *Zeimer*, ¶ 54. The State does not argue, nor did it before the District Court, that any exception to the exclusionary rule should apply if the search of Mefford's photo gallery were held unlawful. We have recognized, however, "that the question of whether evidence would have been inevitably discovered is one we can answer *sua sponte, provided there is*

29

*a sufficient record before us to make that determination*." *State v. Ellis*, 2009 MT 192, ¶ 47, 351 Mont. 95, 210 P.3d 144 (emphasis added).

¶47    We consider whether there is a sufficient record of "inevitable discovery" to answer the question sua sponte. *See Ellis*, ¶¶ 47-48. Though the Application for Leave to File an Information included additional facts to support probable cause, there is no record evidence suggesting that this information would have been "inevitably discovered" but for Miller's warrantless search of the phone. *See Ellis*, ¶ 47. The inevitable discovery exception applies when "the tainted evidence would have inevitably been discovered through lawful means." *Ellis*, ¶ 49. The critical question under the exception is whether the untainted evidence "was the result of the exploitation of the initial illegal search[]." *State v. Laster*, 2021 MT 269, ¶ 45, 406 Mont. 60, 497 P.3d 224 (alterations omitted).

¶48    Here, the only additional evidence is that Mefford's cellmate reported to a detective that, while incarcerated in the Montana State Prison, Mefford admitted that he engaged in "sex acts that involved children." His cellmate made this report during the period that Mefford was incarcerated due to his parole revocation, which resulted from Miller's illegal search of his phone. The only reason Mefford was incarcerated and his phone seized was because of Miller's search on November 29, 2016. The record therefore does not substantiate that the inevitable discovery exception would apply, even if the State had argued for the exception. Because there is not a sufficient record to make this determination, we do not sua sponte consider the question.

¶49    The record clearly indicates that Miller's illegal search of Mefford's phone served as the basis for the warrant application, the Information, and the evidence presented at

30

Mefford's trial. The record shows, therefore, that the images of child pornography that were extracted from Mefford's phone would not have been discovered but for Miller's illegal search of his photos. Detective Williams would not have obtained a warrant to extract the images had Miller not searched Mefford's phone on November 29, 2016. Those photos served as the evidentiary basis upon which Mefford was convicted. They are, therefore, subject to suppression under the exclusionary rule. As "fruit of the poisonous tree," the contraband discovered as a consequence of Miller's unlawful search should have been suppressed under the exclusionary rule. *See Zeimer*, ¶ 54.

## CONCLUSION

¶50  We conclude that Miller's warrantless search of Mefford's digital photo gallery on his phone was unlawful because it was not executed pursuant to a valid warrant exception and therefore was not reasonable within the meaning of the Montana and United States Constitutions. We reverse the District Court's Order Denying Defendant's Motion to Suppress and Dismiss and vacate its Corrected Judgment and Order of Commitment.


/S/ BETH BAKER


We Concur:

/S/ LAURIE McKINNON
/S/ INGRID GUSTAFSON
/S/ DIRK M. SANDEFUR

Justice James Jeremiah Shea, concurring and dissenting.

¶51 I concur with the Majority's conclusion that the scope of Miller's search exceeded Mefford's consent and did not fall within the consent exception to the warrant requirement for a lawful search. Opinion, ¶ 29. I dissent from the Majority's conclusion that the search of Mefford's photo gallery was not a permissible probationary search. Opinion, ¶ 44. I would hold the totality of the circumstances in this case provided reasonable cause to search Mefford's photo gallery.

¶52 The probation search exception allows a probation or parole officer to search a parolee's property "without a warrant or probable cause for evidence of violation of a probation condition or the criminal law if: (1) such searches are generally authorized by an established state law regulatory scheme that furthers the special government interests in rehabilitating probationers and protecting the public from further criminal activity by ensuring compliance with related conditions of probation and the criminal law; (2) the probation officer has reasonable cause to suspect, based on awareness of articulable facts, under the totality of the circumstances that the probationer may be in violation of his or her probation conditions or the criminal law; and (3) the warrantless search is limited in scope to the reasonable suspicion that justified it in the first instance except to the extent that new or additional cause may arise within the lawful scope of the initial search." *Peoples*, ¶ 17. "The reasonable cause standard is substantially less than the probable cause standard required by the Fourth Amendment because of the probationer's diminished expectation of privacy." *Burchett*, 277 Mont. at 195-96, 921 P.2d at 856 (internal quotations omitted).

32

An officer need not necessarily "be certain, or even ultimately correct, that a person is engaged in criminal activity." *See Hoover*, ¶ 18.

¶53    The Majority assesses this encounter through the narrow lens of Mefford's curfew violation. The Majority fails to consider all of the circumstances attendant to the encounter between Mefford and the parole officers that culminated in the search of Mefford's photo gallery. In this case, the totality of the circumstances prior to Miller's search of Mefford's photo gallery are these:[1] (1) Miller and Finley conducted a home visit because Mefford violated his parole by being out well after his curfew; (2) the home visit was necessary because Mefford instructed his girlfriend to call Finley that morning to tell him that he would not be reporting to the probation and parole office as required because he injured his back; (3) Finley thought Mefford had been drinking in violation of his parole and thought Mefford "was trying to dodge him" which is why Mefford had his girlfriend call Finley to tell him he was not going to report as required, instead of calling Finley himself; (4) a previous search of Mefford's residence revealed he had beer in his possession; (5) Mefford's explanation for his curfew violation was that he was messaging his sixteen-year-old daughter until 3:00 a.m.; (6) Mefford could tell that Miller also thought he was lying so Mefford offered to verify his explanation by asking his girlfriend to retrieve his phone to show it to Miller; (7) although the messages confirmed Mefford was communicating with *someone* at 3:00 a.m., well after his curfew and in violation of his probation, the profile photograph of the individual with whom Mefford was messaging did

---

[1] Unless otherwise noted, the facts set forth are taken from Miller's and Mefford's uncontroverted testimony at the suppression hearing.

not appear to Miller to be a sixteen-year-old girl; and (8) rather than the messages confirming Mefford's story as to why he was violating his curfew, Miller now suspected Mefford was lying to him about the identity of the individual with whom he was communicating at 3:00 a.m. in violation of his parole.

¶54 In summary, at the point at which Miller opened Mefford's photo gallery, Finley and Miller knew that Mefford had violated his parole by being out well after curfew the preceding weekend; they suspected Mefford may have committed an additional parole violation by drinking because he failed to report to their office as required and did not call them himself to explain why he was failing to report; and, rather than Mefford's explanation for his curfew violation allaying their suspicions, it exacerbated them because it appeared to them that Mefford was lying about who he was messaging at 3:00 a.m. So what are they to do with their suspicions as to Mefford's activities? According to the Majority—nothing. The Majority holds that at this point, "the officers' suspicion was confirmed: Mefford violated a condition of his parole by leaving his apartment after 10:00 p.m. on November 26, 2016." Opinion, ¶ 37. But that was not the basis for Miller's search of Mefford's photo gallery. The officers' suspicions regarding Mefford's curfew violation had been confirmed even before Mefford offered up his phone to substantiate the reason for this violation. When Miller reviewed the messages and saw the profile picture that did not appear to comport with Mefford's description of a sixteen-year-old girl, this gave rise to new suspicions that Mefford was lying to them about who he was communicating with, constituting new or additional cause which arose within the lawful

34

scope of the initial search that allowed Miller to further investigate why, in his estimation, Mefford was lying to him about who he was communicating with. *See Peoples*, ¶ 17.

¶55 It makes no sense to hold, as the Majority does, that Mefford can offer an explanation for a parole violation, offer his phone to verify his explanation, but when his explanation appears to raise even more suspicions of compliance, the officer is just supposed to disregard these new suspicions and stand down. Further investigation in this situation does not vitiate the warrant requirement, as the Majority suggests. *See* Opinion, ¶ 42. The totality of the circumstances presented in this case, and the probation and parole officers' actions in light of those circumstances, necessarily falls squarely within the "degree of flexibility" we accord probation and parole officers when determining how to exercise their supervisory powers. *State v. Conley*, 2018 MT 83, ¶ 18, 391 Mont. 164, 415 P.3d 473 (citing *Burke*, 235 Mont. at 169, 766 P.2d at 256).

¶56 The Majority suggests that Miller had only a "generalized suspicion" of wrongdoing because he did not articulate the specific facts that gave him reasonable cause to search Mefford's photo gallery and no specific facts "gave rise to a suspicion that Mefford possessed contraband of the kind discovered on his phone." Opinion, ¶¶ 38-39. But Miller did not open Mefford's photo gallery for the purpose of searching for contraband. Miller opened Mefford's photo gallery for the express purpose of either confirming or dispelling his suspicion that Mefford was lying to him about Mefford's proffered explanation for his curfew violation. Miller was not required to connect his reasonable suspicion that a crime was being committed to the specific types of crime germane to Mefford's conviction and parole. More broadly, Miller was not even required to be certain or correct as to whether

35

there was criminal activity or a parole violation. *See Hoover*, ¶ 18. Rather, the probation search exception allowed Miller to search Mefford's photo gallery when he had reasonable cause to suspect, based on his awareness of numerous articulable facts, under the totality of the circumstances that Mefford *may* be in violation of his parole conditions when the explanation Mefford offered raised more suspicions because he appeared to be lying about who he was messaging. *See Peoples*, ¶ 17.

¶57 While acknowledging that Miller may have had a reasonable suspicion that Mefford was lying about the identity of the person with whom he was communicating, the Majority nevertheless concludes that Miller did not explain how searching through Mefford's photo gallery "could provide evidence confirming his suspicion." Opinion, ¶ 44. But was it necessary to connect these dots? Common sense and life experience tell us that people have photos of their children on their phones, and those photos often provide context as to the identity of the persons in them. If, for example, Mefford's photo gallery included a photograph of him with the young woman he had been messaging at a party where she is blowing out sixteen candles on a birthday cake, Miller's suspicions would have been allayed. On the other hand, if there were photos of Mefford with the young woman drinking in a bar, Miller's suspicions would have been confirmed.

¶58 It also bears noting that nobody, including Mefford, has questioned Miller's stated motive for looking in Mefford's photo gallery. There is absolutely no suggestion that Miller's stated suspicion that Mefford was not really messaging his daughter was a pretext to rifle through Mefford's phone. Miller did not use his suspicion of Mefford's dishonesty to go searching through Mefford's banking apps or emails on some unfettered fishing

36

expedition. Miller merely opened Mefford's photo gallery to confirm whether Mefford was being honest about his volunteered explanation for his curfew violation or whether Mefford's suspected dishonesty required further investigation. Indeed, Mefford himself acknowledged that Miller wanting to see a photo of his daughter to confirm her identity was reasonable. In response to questioning from his attorney, Mefford testified:

> Q. [H]ad [Miller] said, hey, Brad, can I see a picture of [your daughter] to confirm that this is actually her on this Messenger app, what would you have said?
>
> A. I would have said, sure, no problem, you know.

In light of the photos Mefford had on his phone, it is no wonder that he would have preferred to pull up a photo of his daughter himself rather than allow Miller to look for one. But it is incongruous to hold that a parolee with significantly diminished subjective and objective expectations of privacy, can acknowledge the reasonable basis for a search, yet have the fruits of that search suppressed based on the manner in which it was conducted.

¶59 Miller's search of the photo gallery in Mefford's phone was justified under the totality of the circumstances. Within the context of those circumstances, Miller's search was a reasonable response to either confirm or dispel his suspicion that Mefford was being dishonest about who he was messaging in violation of his curfew and whether that warranted further investigation. On that basis I would affirm the District Court's order denying Mefford's motion to suppress evidence and dismiss the charges against him.

/S/ JAMES JEREMIAH SHEA

37

Chief Justice Mike McGrath and Justice Jim Rice join the Concurrence and Dissent of Justice James Jeremiah Shea.


/S/ MIKE McGRATH
/S/ JIM RICE